UNITED STATES of America, Appellee,

v.

**Mark Lewis SINGER, Appellant.**

UNITED STATES of America, Appellee,

v.

**Oakley Bechtel CLINE, III, Appellant.**

UNITED STATES of America, Appellee,

v.

**Joseph Michael SAZENSKI, Appellant.**

UNITED STATES of America, Appellee,

v.

**Arturo IZQUIERDO, Appellant.**

UNITED STATES of America, Appellee,

v.

**John Patrick REYNOLDS, Appellant.**

Nos. 81–1654, 81–1673, 81–1677 to 81–1679.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 17, 1981.

Decided Aug. 25, 1982.

Rehearing and Rehearing En Banc Granted Oct. 25, 1982.

Meshbesher, Singer & Spence, Ltd., Ronald I. Meshbesher, Carol M. Grant, Minneapolis, Minn., for Mark Lewis Singer.

Bruce Hartigan, Minneapolis, Minn., for Oakley Bechtel Cline, III.

James M. Rosenbaum, U. S. Atty., Daniel W. Schermer, Asst. U. S. Atty., D. Minnesota, Minneapolis, Minn., for appellee.

Friedberg & Peterson, Mark W. Peterson, Minneapolis, Minn., for Joseph Michael Sazenski.

Before LAY, Chief Judge, HENLEY * and ARNOLD, Circuit Judges.

HENLEY, Senior Circuit Judge.

Defendants Mark Lewis Singer, Oakley Bechtel Cline, III, Joseph Michael Sazenski, Arturo Izquierdo, and John Patrick Reynolds appeal from their convictions on a number of drug-related offenses.[1] The

---

* Judge Henley assumed senior status on June 1, 1982.

1. The indictment was in four counts. Singer was convicted on Count I, conspiracy to possess and distribute marijuana, in violation of 18 U.S.C. § 371 and 21 U.S.C. § 841, and Count IV, attempting to distribute marijuana, in violation of 21 U.S.C. § 846. He was sentenced to five years in prison and a $10,000.00 fine on Count I, and a consecutive five years in prison and a $15,000.00 fine on Count IV. Cline was found guilty on Count I and sentenced to five years' imprisonment and a $10,000.00 fine. Reynolds, also convicted on Count I, was sentenced to three years in prison. Izquierdo and Sazenski were convicted on Counts I, II (possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841), and IV. Izquierdo was sentenced to five years on each of these three counts, to run concurrently, followed by a special parole term of two years. Sazenski was sentenced to five years on Count I, a consecutive three-year period on Count II,

principal question presented is whether the district judge so far injected himself into the trial as to give the jury the impression that he favored the prosecution, thus depriving defendants of a fair trial. Several other grounds for reversal also are urged.[2] Specifically, defendants claim that a preindictment delay of twenty months violated the due process clause of the fifth amendment, that searches of Singer's personal effects and of houses in Florida and Minnesota violated the fourth amendment, that the trials of Reynolds and Izquierdo should have been severed, and that a letter addressed to one "Carlos Almaden" was inadmissible hearsay. We conclude that the trial of defendants was not fatally tainted by an appearance of unfairness and that the district court was correct in rejecting defendants' other contentions. Therefore, we affirm the judgments of conviction.

## I

This case involves an alleged drug conspiracy which the government claims operated from October, 1977 to June, 1978. We summarize the facts as the jury could have found them on this record, allowing for all reasonable inferences in support of the verdict. In October, 1977 defendant Mark Lewis Singer, a lawyer, and Marshall Stoll [3] created International Commercial Consultants (I.C.C.), which ostensibly sold handcrafted goods (*e.g.*, baskets and pottery). Defendant Oakley B. Cline traveled from Miami, Florida, to Minnesota in October and leased store space for I.C.C. at 1607 Hennepin Avenue in Minneapolis. On behalf of Midwest Distributing, Inc.—allegedly the name under which I.C.C. was to operate in Minnesota—he acquired the services of Burke Answering Service and rented storage space from Minnesota Mini-Storage in Crystal, Minnesota. He designed the store and made preparations suggesting it would be a lawful business, but there were no indications of commercial activity during the time he leased it. Contrary to Cline's assertion that while engaged in these transactions he used his real name, he in fact used the name "B. Clein."

---

to be followed by a two-year special parole term, and a concurrent three-year term on Count IV. Count III, using a facility of interstate commerce to distribute marijuana, in violation of 18 U.S.C. §§ 1952 and 2, was dismissed by the district court *sua sponte* in the course of its instructions to the jury.

2. The list of defendants' contentions in text is not exhaustive. They make other arguments, all of which we hold to be without merit. The principal points thus rejected without discussion are as follows: that the closing argument of the prosecution to the jury was inflammatory; that the affidavit for the search warrant for containers at Profit-By-Air, Inc., in Miami, contained material falsehoods; that certain shipping labels were received into evidence without proper foundation; that the evidence was insufficient to make a jury question of Cline's guilt; that there was insufficient evidence to make a case against Reynolds; that Officer Carr was not qualified to identify a certain substance as marijuana; that exculpatory evidence was not disclosed in a timely fashion; that there was error in the jury instructions with respect to a claimed withdrawal from the conspiracy; that the in-court identification of Izquierdo was improperly allowed; that the evidence was insufficient to convict defendant Sazenski; and that certain exhibits were erroneously introduced over Sazenski's objection. A complaint is also made that the district court erred in refusing to allow Reynolds a chance to rebut certain statements contained in the presentence report. We note that the transcript of the sentencing proceedings reflects that defendant Reynolds had ample opportunity to question the report and that the district court adequately considered his objections in passing sentence. Therefore, we conclude that there is no merit to this claim.

Also before us are two pre-argument motions of defendant Singer: a motion to strike arguments I and II from the Brief of Appellee United States, and a motion to compel disclosure of material apparently submitted to the district court *in camera* and *ex parte* by the government. Both of these motions relate to the question of preindictment delay. We have not considered the factual assertions in arguments I and II of the government's brief that are claimed to be outside the record. The motion to strike therefore need not be ruled on. No *in camera* material has been submitted to us, and at the oral argument counsel for the government expressly consented to our reviewing the district court's conclusion that there was a continuing investigation without regard to any *in camera* material submitted to that court. The motion to compel disclosure of *in camera* material is therefore denied as moot.

3. Stoll was indicted along with the appellants, but he is now a fugitive. He was a client of Singer.

Another corporation, Tropical Topics, Inc., then began delivering large boxes to Airborne Air Freight for shipment from Miami to Minnesota Mini-Storage. Midwest Distributing was the recipient company, and someone calling himself "Cliff Clorall" signed for the boxes. At trial, an Airborne Freight supervisor identified Cline as the person who used the name Cliff Clorall.

On April 5, 1978, Public Safety Officer Richard Carr, while on a routine patrol, investigated a possible burglary at 7730 S.W. 112th Street in Miami, Florida. He found defendant John Reynolds and Stoll weighing a bale of marijuana and defendant Arturo Izquierdo nearby. Carr arrested the three men and notified other officers, who arrived and seized from the house and nearby parked vans approximately 1,500 pounds of marijuana. They also seized "Poly-Crock" (white plastic) containers, boxes similar to those which "Cliff Clorall" was receiving via Airborne Freight, and a shipping label which identified "Cliff Clirell," 32 Tenth Avenue South, Hopkins, Minnesota,[4] as shipper, and O. B. Cline, Gainesville, Florida, as receiver. A later investigation indicated that Ashton Company of Curacao, Netherlands Antilles, owned the house.

The drug ring continued to operate after these arrests. A man calling himself "Carlos" rented a new storage locker at Minnesota Mini-Storage in Eden Prairie, Minnesota, on April 20, 1978, on behalf of "Venture Design." The rental manager identified Izquierdo as the person who leased the storage unit. An unidentified person rented an answering service on behalf of "Venture Design" on April 26, 1978.

Defendant Mark Singer began delivering suspiciously overpacked cartons to Profit-By-Air, an air-freight shipping concern in Miami, at about this time. On June 7, 1978 "Venture Design" shipped four cartons of "display materials" to "LDT, Inc.," 101 Westwood Drive, Miami Springs, Florida. Singer delivered ten boxes to Profit-By-Air for shipment on June 8, 1978. The shipper was "LDT." Five boxes, weighing 232 pounds, were to be shipped to "Venture Designs" in Minnesota and were to be received by "Carlos Almaden." The other five boxes, weighing 254 pounds, were to be shipped to "S&D Designs" of San Francisco. The shipping manager suspected that the cartons contained contraband and called the police. The police opened the boxes pursuant to a search warrant and found Poly-Crock containers filled with marijuana.

The next day, when Singer arrived to deliver more cartons and pick up the June 7 shipment from "Venture Design", he was arrested. The boxes he brought with him were searched and found to contain marijuana. The boxes which Singer was receiving from Minnesota were also searched, and found to contain empty Poly-Crocks. He was carrying a folder which had on its outside the address of a warehouse. The police obtained a search warrant for the warehouse. Inside they found packing material similar to that which they had seized from Singer and several bales of marijuana. Singer's folder contained numerous documents relating to the marijuana shipments and to the evidence found in the warehouse. In his wallet the police found documents which linked him to Cline, ICC, Inc., at 1607 Hennepin in Minneapolis, and the Ashton Company. The officers searched Singer's briefcase and found other documents which linked him to the Ashton Company, defendant Joseph Sazenski, and Izquierdo, as well as a list of business expenses which related to the conspiracy.

The Miami police notified Sergeant Ronald Johnson of the Minneapolis Police Department of these events. He set up surveillance at the Minneapolis office of Profit-By-Air and arrested Patrick Sazenski,[5] who arrived to pick up the shipment to "Venture Design."

Sergeant Michael Strauss of the Minneapolis Police Department then obtained a search warrant for Joseph Sazenski's home at 600 Wilshire, Minnetonka, Minnesota. The police found a gram scale; marijuana;

---

4. This was the address of Burke's Answering Service.

5. Patrick Sazenski was not charged.

an eviction notice addressed to "Carlos Almaden and Joseph Sazenski, 600 Wilshire Drive, Minnetonka, Minnesota"; a letter addressed to "Arthur Izquierdo, 600 Wilshire"; a statement for Venture Design's storage locker at the Minnesota Mini-Storage; and evidence that Joseph Sazenski had substantial amounts of cash. They also found documents which contained drug notations and a reference to "ICC." The police obtained a warrant to search Venture Design's storage locker at Eden Prairie and found six Poly-Crock containers containing about 300 pounds of marijuana.

On June 22, 1978 Sergeant Johnson executed a search warrant at 4620 Highland, Minnetonka, Minnesota; Izquierdo was identified as the "Paul Darien" who had rented the residence in February, 1978. Johnson found a notebook containing an Airborne Air Freight shipment number which corresponded to a shipment from Tropical Topics to Midwest Distributing, a notebook bearing Izquierdo's fingerprints and drug notations, and other evidence linking Izquierdo to the conspiracy.

## II

This complex, multidefendant case was tried before a jury from December 8 to December 18, 1980. Each of the six defendants [6] tried retained individual counsel.

6. One of the defendants, Scott Cline, was acquitted by the jury.

7. It bears noting that the trial court also made critical comments which possibly could have aroused feelings adverse to the government.

8. Earlier in the trial the court summoned United States Attorney Thomas Berg to a conference in chambers and requested that he assign another Assistant United States Attorney to "second-chair" Mr. Schermer, the Assistant United States Attorney who had been trying the case. Mr. Berg declined and responded to the trial court's ensuing order to assign an additional prosecutor by asking for a recess to consider the matter. The court then relented and allowed the case to proceed without additional counsel for the government.

9. The court stated:
> I made a mistake . . . in trying to get this in perspective and set up so that you would

One Assistant United States Attorney tried the case for the government.

The district judge actively intervened in the trial. He suggested to government counsel grounds for objection to prolonged, repetitious cross-examination and questioned a number of prosecution witnesses himself when the Assistant United States Attorney failed to elicit proper foundation testimony. The trial judge also made comments which conceivably could have caused jurors to have sympathy for government counsel.[7] On the sixth day of trial, for instance, the court, interrupting one of the defense attorneys, made the following remarks about the prosecutor in the presence of the jury:

> THE COURT: Hey, there's one lawyer up here who I wanted them to get some help for, and they won't send him any.[8]

> \* \* \* \* \* \*

> And he's just about overwhelmed.

Later that day, counsel for one of the defendants moved for a mistrial on the ground that the judge's remarks would evoke the jury's sympathy for the prosecution and result in prejudice to the defense. The court denied the motion, but promptly and adequately admonished the jury not to feel sorry for the Assistant United States Attorney.[9]

> understand it, and I said, "Well, Schermer's busy and he's overwhelmed."
>
> Well, he is not overwhelmed.
>
> He represents the Government; and if the Government can't send enough people up here to do their case right, then they deserve to lose if—by so doing—they don't get the evidence in and make mistakes and mess up the case.
>
> So don't go feeling sorry for Schermer. He's tried dozens of cases for the Federal Department of Justice, criminal, income-tax cases, he's tried narcotics cases, he's done all kinds of things, and he has wonderful credentials.
>
> Sometimes I make him do it my way, but don't go feeling sorry for him.
>
> And I'm sorry I said that.
>
> He is not overwhelmed.
>
> He is a tiger. . . .
>
> In context, the remark about counsel's being "a tiger" could not have been taken seriously.

However, the trial judge's comments were not all directed to counsel for the government, and the breaks of the trial did not all fall the same way. For example, on two occasions the court interrupted questioning by the prosecutor and sent the jury out in anticipation of a defense objection concerning evidence that the defense wished to suppress. The trial judge also preserved an objection for defendants; questioned witnesses during defense examination; occasionally suggested questions to the defense, including some designed to lay a proper foundation; and reprimanded government counsel and directed him to stop his examination of a witness when he exceeded the scope of permissible questioning under an agreement between the parties.

■ Although the trial judge played an active role in this lengthy, complex trial, a careful reading of the transcript leaves us with no firm impression that his commentary and questioning resulted in fundamental unfairness or specific prejudice to defendants.[10] Contrary to defendants' contentions, the judge did not evince the attitude of an advocate for the government, *see United States v. Johnson*, 657 F.2d 604, 605–06 (4th Cir. 1981); *United States v. McDonald*, 576 F.2d 1350, 1358 (9th Cir.), *cert. denied*, 439 U.S. 830, 927, 99 S.Ct. 105, 312, 58 L.Ed.2d 124, 320 (1978); *United States v. Lamont*, 565 F.2d 212, 220–21 (2d Cir. 1977), *cert. denied*, 435 U.S. 914, 98

S.Ct. 1467, 55 L.Ed.2d 505 (1978), nor did his attitude toward government counsel create sympathy for the prosecution. He aided *both* government and defense counsel in pursuing a proper course of questioning. Likewise, he directed his adjurations and remarks to counsel for both parties.[11] Many of his questions to witnesses and comments to counsel were properly designed to minimize delay and confusion and maximize the orderly and clear presentation of evidence. *See, e.g., United States v. Price*, 623 F.2d 587, 593 (9th Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980); *United States v. McDonald*, 576 F.2d at 1358. A reading of the record clearly indicates that his intervention in the trial benefited the government neither less nor more than the defendants.

■ It is significant to note that no objection to judicial intervention was voiced until the sixth trial day near the end of the government's case-in-chief, and then by counsel for only one of the defendants. That objection promptly was honored by the trial judge's adequate admonition to the jury.[12] Where able counsel see fit to voice only a single objection throughout the course of a lengthy trial, it is difficult to conclude from afar that the trial judge was guilty of misconduct, much less of plain and egregious error which should be our touchstone in such cases. Even though the comments of the trial judge may exceed the

---

**10.** In determining whether a trial judge overstepped the bounds of appropriate judicial intervention by participating directly in the trial, an appellate court should in studying the record, consider the nature and intricacy of the charges, the length of the proceedings, the number of defendants and defense counsel, the volume and complexity of evidence, and the conduct of counsel and witnesses. *See United States v. Hawkins*, 661 F.2d 436, 450 (5th Cir. 1981); *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979); *United States v. Smith*, 561 F.2d 8, 14 (6th Cir.), *cert. denied*, 434 U.S. 958, 972, 98 S.Ct. 487, 741, 54 L.Ed.2d 317, 766 (1977); 434 U.S. 1019, 1048, 98 S.Ct. 741, 897, 54 L.Ed.2d 766, 800 (1978). The record as a whole, *see, e.g., United States v. Bartlett*, 633 F.2d 1184, 1188 (5th Cir.), *cert. denied*, 102 U.S. 101, 102 S.Ct. 101, 70 L.Ed.2d 91 (1981); *United States v. Moore*, 555 F.2d 658, 661 (8th Cir. 1977), must neither disclose actual bias on the

part of the trial judge nor leave the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality. *See, e.g., United States v. Gunter*, 631 F.2d 583, 587 (8th Cir. 1980); *United States v. Panza*, 612 F.2d 432, 440 (9th Cir. 1979), *cert. denied*, 447 U.S. 925, 926, 100 S.Ct. 3019, 3020, 65 L.Ed.2d 1118 (1980); *United States v. Harris*, 546 F.2d 234, 238 (8th Cir. 1976).

**11.** While the trial judge may well have limited witness examination without prompting government counsel to make specific objections, we conclude that, in context, this practice did not result in prejudice to defendants. *See Morris v. United States*, 572 F.2d 185 (8th Cir. 1978) (per curiam).

**12.** *See* n.9 *supra*.

bounds of propriety, an appellate court should be slow to reverse for alleged misconduct unless that misconduct was intended or calculated to disparage the defendant and to prevent the jury from exercising an impartial judgment. *La Barge Water Well Supply Co. v. United States*, 325 F.2d 798 (8th Cir. 1963); *Agee v. Lofton*, 287 F.2d 709 (8th Cir. 1961); *see United States v. Baron*, 602 F.2d 1248, 1249–50 (7th Cir.), *cert. denied*, 444 U.S. 967, 100 S.Ct. 456, 62 L.Ed.2d 380 (1979).

Further, in considering prejudice to be attributed to a judge's remarks, we as appellate judges may tend to guard the jury too zealously. Although it is said on high authority that the influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word is received with deference, *see Quercia v. United States*, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933); *Starr v. United States*, 153 U.S. 614, 14 S.Ct. 919, 38 L.Ed. 841 (1894), experience in this circuit teaches that jurors are not always reluctant to disregard very strong comments, even those which the trial judge has a right to make, and return a verdict utterly inconsistent with the judge's view of the evidence. *See, e.g., Compton v. United States*, 377 F.2d 408 (8th Cir. 1967).

As then Judge (now Chief Judge) Lay put it in *United States v. Porter*, 441 F.2d 1204, 1215 (8th Cir.), *cert. denied*, 404 U.S. 911, 92 S.Ct. 238, 30 L.Ed.2d 184 (1971);

Experience and study indicate, however, that the composite jury possesses far more intelligence than most judges and lawyers credit to it. The ability to fairly weigh the evidence, to discard irrelevancies, to assess equity and to ignore prejudicial comment of lawyers and judges alike is the underlying strength of the jury system.

(Footnote omitted.)

We should look also to the strength of the government's case for in the past we have refused to reverse on account of judicial comments where, as here, evidence of guilt is strong.[13] *United States v. Porter, supra; United States v. Dunmore*, 446 F.2d 1214 (8th Cir. 1971), *cert. denied*, 404 U.S. 1041, 92 S.Ct. 726, 30 L.Ed.2d 734 (1972); *United States v. Haley*, 452 F.2d 391 (8th Cir. 1971), *cert. denied*, 405 U.S. 978, 92 S.Ct. 1205, 31 L.Ed.2d 253 (1972).

In sum, we have before us relatively mild judicial intervention, strong evidence of guilt, a dearth of timely objection, and prejudice that is speculative at best. Whether another judge would have intervened less or in different fashion is difficult to say. Each judge has his own manner. As an appellate court we cannot and should not dictate a trial judge's every move. As has been observed so often, it is difficult indeed for an appellate court to reproduce accurately for itself the warm vigor and atmosphere of the jury trial. *See, e.g., La Barge Water Well Supply Co. v. United States*, 325 F.2d at 801. On balance, we cannot say that the trial judge's particular manner of controlling the trial in this case projected to the jury a less than neutral posture.

### III

We now turn to the additional grounds for reversal urged by defendants.

### A

■ Defendants first contend that a twenty-month preindictment delay violated their fifth amendment right to due process.[14] To make out a violation they must

---

13. At least one other circuit adheres to this approach. *See United States v. Poland*, 659 F.2d 884, 894 (9th Cir.), *cert. denied*, 454 U.S. 1059, 102 S.Ct. 611, 70 L.Ed.2d 598 (1981); *United States v. Price*, 623 F.2d 587, 593 (9th Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980).

14. Singer also alleges that the government violated a Florida speedy-trial rule, Fla.Ct.Cr.P.R. 3.191, because he was not tried within 180 days of his state arrest, and the Federal Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*, and the sixth amendment because he was not indicted within thirty days of being arrested by *state* authorities. Whereas preindictment delays normally involve due-process rights, delays which occur after a defendant has been arrested can raise questions under the speedy trial clause of the sixth amendment and the federal speedy-trial statute. *See United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Singer's speedy-trial arguments are untenable after *United States v. McDonald*, —— U.S. ——, —— n.11, 102 S.Ct. 1497, 1503 n.11, 71 L.Ed.2d 696 (1982), where the Supreme Court said: "Of

prove they suffered actual prejudice not outweighed by the reasons for the delay. *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).

We do not stop to detail the respects in which defendants claim they were prejudiced by delay, though Singer may have suffered some actual prejudice. Jeb Moore visited defendant's attorney, Ivan Benjamin, in August, 1978 and indicated that he would testify on behalf of Singer and that he had "testimony-type evidence that would show [Singer] to be innocent" of drug-related offenses. Moore died in December, 1979, and his in-court testimony was lost. The existence of prejudice, however, requires only that we examine carefully the reasons for the delay. It is the statute of limitations, after all, that fixes the permissible length of preindictment delay in most cases. Delay for a shorter period of time will bar prosecution only if prejudice exists and the reasons for the delay do not meet the standards laid down by the Supreme Court.

In *United States v. Lovasco, supra,* the Supreme Court rejected the proposition that a preindictment delay is unjustified if it is based solely on hope that others might be discovered who may have participated in the crime. The Court held that the existence of an ongoing investigation is a reasonable justification for a delay even if the defendant suffers some prejudice, and that "the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with the prosecutor's judgment as to when to seek an indictment." 431 U.S. at 790, 97 S.Ct. at 2048. If the government is conducting a further investigation, it may defer filing charges even after it has assembled enough evidence to prove guilt beyond a reasonable doubt. *Id.* at 792, 97 S.Ct. at 2050.

In *Lovasco* the record revealed no justification for the delay beyond representations by government counsel that the investigation was continuing. *Id.* at 796, 97 S.Ct. at 2052. Moreover, the case was not a com-

plex drug conspiracy, but a relatively simple indictment for possessing and dealing in stolen firearms without a license. The Court nonetheless noted, *ibid.,* that

[a]lthough there is, unfortunately, no evidence concerning the reasons for the delay in the record, the court's "finding" [that the only reason the Government postponed action was to await the results of additional investigation] is supported by the prosecutor's implicit representation to the District Court, and explicit representation to the Court of Appeals, that the investigation continued during the time that the Government deferred taking action against respondent. The finding is, moreover, buttressed by the Government's repeated assertions in its petition for certiorari, its brief, and its oral argument in this Court, "that the delay was caused by the government's efforts to identify persons in addition to respondent who may have participated in the offenses." Pet. for Cert. 14. We must assume that these statements by counsel have been made in good faith.

■ In the case at hand a more specific showing of the reasons for delay has been made on the record. There was testimony that the delay was the result of an ongoing investigation of fifteen potential defendants including the "kingpin" of the conspiracy and the intended recipients of the marijuana destined for San Francisco. There was, moreover, evidence that at least one of the defendants was indicted, in part, as a result of investigations conducted as late as 1980. Some of the defendants could have been prosecuted as early as late 1978, but as noted by *Lovasco, supra,* at 792–93, 97 S.Ct. at 2050,

compelling a prosecutor to file public charges as soon as the requisite proof has been developed against one participant on one charge would cause numerous problems in those cases in which a criminal transaction involves more than one person or more than one illegal act. In some instances, an immediate arrest or indict-

course, an arrest or indictment by one sovereign would not cause the speedy trial guaran-

tees to become engaged as to possible subsequent indictments by another sovereign."

ment would impair the prosecutor's ability to continue his investigation, thereby preventing society from bringing law-breakers to justice. In other cases, the prosecutor would be able to obtain additional indictments despite an early prosecution, but the necessary result would be multiple trials involving a single set of facts. Such trials place needless burdens on defendants, law enforcement officials, and courts.

The government perhaps did not pursue the investigation as diligently as it might have, but the fact remains that there was an ongoing investigation. The case would apparently be otherwise, see *Lovasco*, 431 U.S. at 795 n.17, 97 S.Ct. at 2051 n.17, if the government deliberately delayed indictment to gain a tactical advantage, or if prosecutors created an appreciable risk of impairing the ability to mount an effective defense by acting in reckless disregard of known circumstances. We see no such misconduct by the government in this case.

## B

█ Izquierdo and Reynolds contend that the warrantless entry into 7730 S.W. 112th Street in Miami violated their fourth amendment rights.[15] Even if defendants had a legitimate expectation of privacy in the residence, exigent circumstances nonetheless justified a warrantless entry. *See*

*Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978).[16] While Officer Carr was patrolling the vicinity, a next-door neighbor told him there were strangers in the vacant residence at 7730. As he walked down the driveway to investigate, Scott Cline emerged from the back of the house. He could not say who lived there or the reason for his presence. Carr proceeded to the rear of the house and saw a pickup truck backed up to the propped-open rear door. At this point it seemed apparent that a burglary was in progress; these circumstances justified a warrantless entry into the dwelling itself, and immediately after entry, while still in the open doorway, the officer observed a bale of marijuana. *See Roaden v. Kentucky*, 413 U.S. 496, 505, 93 S.Ct. 2796, 2801, 37 L.Ed.2d 757 (1973).[17] Officer Carr, moreover, had a right to be on the premises as part of his routine community caretaking functions, which include responding to notice of what appeared to be a burglary in progress. *See United States v. Nord*, 586 F.2d 1288 (8th Cir. 1978). It would defy reason to suppose that he had to leave the area and secure a warrant before investigating, leaving the putative burglars free to complete their crime unmolested. It is only "unreasonable" searches and seizures that the fourth amendment forbids.

15. The district court denied the motions to suppress without making findings of fact. Findings should have been made. We may still, however, rule on this issue, because the record provides enough information to do so.

16. Reynolds notes that a Florida court, prior to the state's dismissal of its case, held a hearing on a motion to suppress and found no probable cause for entry. He argues that the federal court should have applied the doctrine of collateral estoppel to the question of probable cause. This argument is without merit. Whereas the State of Florida was prosecuting the case before the Florida court, the United States is now prosecuting this case. *Compare United States v. Elkins*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

17. There is no merit to the argument that the mere warrantless entry upon the driveway was a violation of the fourth amendment and could be justified only by showing exigent circumstances. In determining whether an area adjoining a home is within the protection of the

fourth amendment one must look to a resident's expectation of privacy there. We do not believe that people have the same expectations of privacy in their driveways as in their homes. In the course of everyday life we expect members of the public—salesmen, children, or even strangers looking for an address—to enter upon a driveway. *Compare United States v. Humphries*, 636 F.2d 1172, 1179 (9th Cir. 1980), cert. denied, 451 U.S. 988, 101 S.Ct. 2324, 68 L.Ed.2d 846 (1981).

The case at hand is distinguishable from *United States v. Selberg*, 630 F.2d 1292 (8th Cir. 1980), where this court ordered that evidence seized from a home be suppressed. Whereas in this case the neighbor's report was corroborated as soon as Officer Carr walked down the driveway, in *Selberg* the neighbor's report of a robbery was confirmed neither before nor after the police went into the house. There were absolutely no signs of a robbery in progress and no emergency situation.

## C

We also reject Izquierdo's and Joseph Sazenski's contentions that the affidavit in support of the search warrant for 600 Wilshire Drive in Minnetonka did not establish probable cause for the issuance of a search warrant. The issuing magistrate, to whose judgment we give some weight, had before him a detailed affidavit which contained the following facts:

1. That Singer had been arrested in Miami after having delivered boxes of marijuana for shipment to Minneapolis, and that he was involved in a conspiracy to distribute at least 1,600 pounds of marijuana.

2. That the boxes were addressed to Venture Design, Carlos Almaden, 464 2d Street in Excelsior, Minnesota, but that both the address and the company were fictitious.

3. That Singer, when arrested, had the name and telephone number of Joseph Sazenski in his address book.

4. That Patrick Sazenski arrived to pick up the boxes of marijuana.

5. That Patrick Sazenski said he had been sent by "Carlos."

6. That Patrick Sazenski had with him a document with the name "Carlos," the shipping number of the shipment, and a letter addressed to Frank Sazenski at 819 Lowry Drive, North Minneapolis, Minnesota.

7. That appellant Joseph Sazenski and "Carlos Almaden" were renting the 600 Wilshire residence as of June 13, 1978—the day of the search.

8. That the vehicle which Patrick Sazenski drove was registered to Delores Sazenski, who lived at 810 Lowry Drive, North Minneapolis, Minnesota, and a second vehicle also registered to Ms. Sazenski was parked at the 600 Wilshire residence on June 13, 1978.

9. That the police had received a complaint that 600 Wilshire was used for drug distribution.

 The determination of probable cause *vel non* depends on a reading of the affidavit as a whole. *United States v. Sumpter*, 669 F.2d 1215 (8th Cir. 1982). On its face the document in the case at hand indicates that there was a drug conspiracy; that an associate of Joseph Sazenski—Mark Singer—had been apprehended; and that people with the last name Sazenski[18] had been delivering very large quantities of drugs on behalf of Singer to Sazenski's housemate, "Carlos Almaden." These facts implicate "Almaden" in the conspiracy and suggest that he kept accounts, paraphernalia, and drugs at his home. When we add the affidavit's assertion that there had been a complaint that the 600 Wilshire residence was used for drug traffic, it is evident that a magistrate could reasonably have concluded that there was probable cause for the issuance of a search warrant.[19] *See United States v. McClard*, 333 F.Supp. 158 (E.D. Ark.1971), *aff'd per curiam*, 462 F.2d 488

---

18. Patrick Sazenski seems to have been a cousin of defendant Joseph Sazenski.

19. Sazenski contends that the complaint about drug traffic and the information from the owner of 600 Wilshire that he and "Almaden" rented the residence were unreliable and entitled to no weight under *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). We reject this contention for two reasons. First, the use of the word "complaint" in the affidavit rather than some such term as "tip" implied to the magistrate that the information had come from an ordinary cooperative citizen, rather than from an "informant" properly so called. When the source of information is an ordinary cooperative citizen, the proof-of-veracity rules which obtain in informant cases are inapplicable, and the information received is presumed reliable. While an "informer" usually expects gain or concession in exchange for information, the ordinary citizen who reports a crime does so because of his concern for society. 1 La Fave, *Search and Seizure* § 3.4, at 586–91. *See United States v. Sumpter*, 669 F.2d 1215, 1221–22 (8th Cir. 1982). Second, the "complaint" that had been received by no means stands alone here. The affidavit contains many other details linking Joseph Sazenski and "Almaden" and, by inference, their residence with what reasonably appeared at the time to be a drug conspiracy. Affidavits for search warrants should be given a practical construction. They are not to be parsed like common-law pleadings.

(8th Cir.), *cert. denied*, 409 U.S. 988, 93 S.Ct. 345, 34 L.Ed.2d 255 (1972).

### D

 We also reject Singer's assertion that the search and seizure of his folder, briefcase, wallet, and documents violated his fourth amendment rights. At the time of the arrest, he was carrying the folder. When a lawful arrest is made, it is permissible to search what is within the control of the person apprehended whether the article is sealed or not, because "the justification for the search is not that the arrestee has no privacy interest ... but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have." *New York v. Belton*, 453 U.S. 454, 461, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981). The purpose of this rule is to prevent an "arrestee" from gaining possession of a weapon or destroying evidence. Singer contends that the search was unnecessary in this case, because at the time the police officer had already gained control of the folder, and there was no risk of losing the evidence. The Supreme Court, however, has explicitly rejected this argument, noting that under it "no search or seizure incident to a lawful custodial arrest would ever be valid; by seizing an article even on the arrestee's person, an officer may be said to have reduced that article to his 'exclusive control.'" *Id.*, at 462 n.5, 101 S.Ct. at 2865 n.5.

Before being taken to the police station Singer requested permission to get his briefcase from his car. Officer Burgin consented and evidently searched the briefcase superficially and found a wallet in it; there is no indication that the wallet was removed. At the station Burgin noticed that the briefcase had again been opened by Officer Crandall and that the wallet was next to it on a desk and had also been searched. Burgin was concerned that there had been an improper search, but Crandall assured him that Singer had consented. Burgin asked Singer if he had. Burgin

testified that Singer responded by saying "I'm an officer of the Court, and I want to cooperate with you people in any way I can," and that Singer in no way protested the search of the wallet. The district court found that when Singer gave the police permission to search the briefcase, the wallet was contained within. The consent applied to both the briefcase and the wallet, the court found. These findings are not clearly erroneous.

 There is likewise no merit to Singer's argument that a strap seized from his car at the time of arrest should be suppressed. It was in plain view and similar to the strap used to package the boxes which contained marijuana. Incriminating "objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence," *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968).

### E

 Izquierdo contends that his motion for a severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure [20] should have been granted because his defense, at least in part, depended upon his showing that Cline, and not he, had been identified under incriminating circumstances. It is, however, within the trial court's discretion to deny a motion for severance, and "to show an abuse of discretion [a defendant] must show more than that his strategy was generally antagonistic to that of the other co-defendants.... It must at the very least show that the conflict is so prejudicial that the differences are irreconcilable." *United States v. Boyd*, 610 F.2d 521, 526 (8th Cir. 1979), *cert. denied*, 444 U.S. 1089, 100 S.Ct. 1052, 62 L.Ed.2d 777 (1980) (citations omitted). This is a difficult burden to bear. This is not a case in which the sole defense or its predominant basis was the guilt of a co-defendant, *see*

**20.** If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial to-

gether, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

*United States v. Crawford*, 581 F.2d 489 (5th Cir. 1978). We conclude that the court acted within its discretion when it denied Izquierdo's motion for a severance.

Reynolds argues that his motion for a severance should have been granted because, though his criminal activity was minimal, it was given greater magnitude and scope in the context of a prolonged multi-defendant trial. We rejected a similar argument in *United States v. Boyd*, 610 F.2d at 525.

## F

The district court admitted into evidence an envelope addressed to Sazenski and "Carlos Almaden," 600 Wilshire, containing notice to terminate their tenancy. It was introduced to show that "Carlos Almaden" lived with Sazenski. We reject Sazenski's contention that this letter was hearsay.

Fed.R.Evid. 801(c) states: "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The Advisory Committee for the proposed Rules of Evidence noted that "[t]he effect of the definition of 'statement' is to exclude from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion.... [Some] nonverbal conduct ... may be offered as evidence that the person acted as he did because of his belief in the existence of the condition sought to be proved, from which belief the existence of the condition may be inferred." This observation is consistent with the purpose of the hearsay rule—the exclusion of declarations whose veracity cannot be tested by cross-examination. There is some guarantee that an inference drawn from out-of-court behavior is trustworthy, because people base their actions on the correctness of their belief. 4 Weinstein, *Evidence* § 801—53–56 (1981). If this letter were submitted to *assert* the implied truth of its *written contents*—that Carlos Almaden lived at 600 Wilshire—it would be hearsay and inadmissible. It is, however, admissible nonhearsay because its purpose is to imply from the landlord's *behavior* —his mailing a letter to "Carlos Almaden,"

600 Wilshire—that "Almaden" lived there. In addition, it is important that the letter was found in the residence at 600 Wilshire.

## IV

Our study of the transcript has disclosed another incident which we feel compelled to note, even though none of the briefs refers to it. When the case was about to go to the jury, counsel for Singer expressed the fear that all twelve jurors might not be able to finish their deliberations. He suggested that the two alternates "be allowed to be part of the jury." All the defense lawyers apparently agreed to allow two alternates to enter the jury room for the deliberations. The court then instructed the jury that "we have a jury of 14 instead of 12. Your verdict still must be unanimous. It's all the same rules." The government did not clearly agree to this procedure, but the court overrode its objections.

As we have noted, this matter was not urged as error, and no claim of prejudice was made. While we do not say that this procedure resulted in prejudice in the instant case, we note that there is absolutely no provision in the Federal Rules of Criminal Procedure for submission of a case to a jury of more than twelve. It is to be expected that the district courts will try cases in accordance with the federal rules. *See United States v. Kaminski*, 692 F.2d 505 (8th Cir. 1982).

## V

From what has been said, it follows that the judgments of the district court should be, and they are, affirmed.

It is so ordered.

ARNOLD, Circuit Judge, concurring in part and dissenting in part.

I concur in Parts I, III, and IV of the Court's opinion, but as to Part II, I respectfully dissent.

Although this is by no means a case of actual bias on the part of the trial judge, my review of the record constrains me to conclude that his repeated remarks in the

presence of the jury, culminating in a reference to his "helping the Government to try its case" prevented the defendants from having their guilt or innocence determined in a proceeding free from a fatal appearance of unfairness. I would therefore, in the exercise of our supervisory power over the administration of criminal justice in this Circuit, reverse the judgments of conviction and remand these cases for a new trial.

As the Court notes, the District Court believed that counsel for the United States needed help. On several occasions the Court intervened in order to assist counsel with his examination or suggest that a certain objection be made. All of the intervention, to be sure, was not directed at helping government counsel, but a great deal of it was.

Matters came to a head on Monday, December 15, 1980, the sixth day of trial. That morning, government counsel of his own accord corrected a statement he had made earlier to the effect that Izquierdo's fingerprints had been found on a certain lease application. Counsel for Izquierdo moved for a mistrial. The District Court (properly) found that the prosecutor's error had been unintentional. When Izquierdo's lawyer then attempted to press his motion, the court interrupted him (Tr. 974):

THE COURT: Hey, there's one lawyer up here who I wanted them to get some help for, and they won't send him any.

MR. RESNICK: Well, that's not my fault.

THE COURT: And he's just about overwhelmed.

Now, Jurors, there is no fingerprint of Mr. Izquierdo on that thing.

Mr. Schermer made a mistake.

So I think you can put that out of your mind, can't you, Jurors?

(Jurors nod their heads affirmatively.)

THE COURT: The motion for mistrial is denied.

The jury is to disregard that.

It didn't happen.

It was a mistake.

Later that day, during a conference in chambers, the defense moved for a mistrial, this time on the ground that, because of the court's remarks earlier that day, "they're [the jury] going to feel sorry for this guy [the Assistant United States Attorney], and as a result it's going to redound to our prejudice" (Tr. 1022–23). The court denied the motion, observing (Tr. 1025–26):

I am not letting Schermer make mistakes. He's tried to make several of them, and I just must concede that I have straightened him out.

And I asked U. S. Attorney Tom Berg to send somebody up here to help him, and Berg wouldn't do it.

But the statement I made to the jury about this man being overwhelmed was unfortunate—but I am going to straighten that out for you.

&ast; &ast; &ast; &ast; &ast; &ast;

And I will straighten them out on the one mistake which I made, which was to say that Schermer was overwhelmed; and—even though it's true—I will straighten it out.

The jurors then returned to the courtroom, and the following took place (Tr. 1026–27):

THE COURT: Ladies and Gentlemen of the jury, I should tell you something.

I made a mistake, and it really probably isn't even factually true.

When Mr. Schermer made that mistake where he said the wrong fingerprints were on the exhibit—he said the fingerprints were from a room that was rented over there, whereas in reality the fingerprints were in what he claims is a drug book—do you remember that?

(The jurors nod affirmatively.)

THE COURT: —that was a mistake he made.

I made a mistake, too, in trying to get this in perspective and set up so that you would understand it, and I said, "Well, Schermer's busy and he's overwhelmed."

Well, he is not overwhelmed.

He represents the Government; and if the Government can't send enough people up here to do their case right, then they deserve to lose if—by so doing—they don't get the evidence in and make mistakes and mess up the case.

So don't go feeling sorry for Schermer. He's tried dozens of cases for the Federal Department of Justice, criminal income-tax cases, he's tried narcotics cases, he's done all kinds of things, and he has wonderful credentials.

Sometimes I make him do it my way, but don't go feeling sorry for him.

And I'm sorry I said that.

He is not overwhelmed.

He is a tiger.

Go ahead.

MR. SCHERMER: Thank you, Your Honor.

As the Court notes, the remark about counsel's being "a tiger" could not have been taken seriously. The Court holds that this admonition to the jury was adequate, but I respectfully disagree. The admonition was clearly facetious, and I cannot believe that the jurors really thought that the District Court believed the Assistant United States Attorney was "a tiger." Rather, the jury almost certainly got the impression that the District Court was adhering to its opinion, earlier expressed in their presence, that counsel for the Government was "overwhelmed."

A few minutes later, the court again interrupted government counsel, this time to keep him from what would apparently have been a breach of an agreement about the proper scope of a witness's examination. The judge instructed counsel as to how to proceed, addressed the witness directly himself, and then stated to the jury: "Now I hope you don't object to my helping the Government to try its case, Ladies and Gentlemen, and Counsel . . . (Tr. 1029).

While it is a judge's privilege and duty to take an active part in the trial where necessary to clarify evidence and assist the jury, a judge must studiously avoid one-sidedness. See *Quercia v. United States*, 289 U.S. 466, 470, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933). In the case at hand the jury

could well have inferred that the judge was siding with the government. While he undoubtedly thought that by aiding and correcting the government attorney, he was merely redressing the balance between several reputable defense lawyers and one "overwhelmed" government attorney, the obvious effects were 1) to place the defense at a disadvantage in the eyes of the jury by casting the prosecutor in the role of an underdog, *United States v. Haley*, 452 F.2d 391, 396 n.2 (8th Cir. 1971), *cert. denied*, 405 U.S. 978, 92 S.Ct. 1205, 31 L.Ed.2d 253 (1972); *United States v. Guglielmini*, 384 F.2d 602 (2d Cir. 1967), and 2) to suggest to the jury that he favored the government's position.[1]

A few improper comments are not necessarily enough to require reversal. *United States v. Porter*, 441 F.2d 1204 (8th Cir.), *cert. denied*, 404 U.S. 911, 92 S.Ct. 238, 30 L.Ed.2d 184 (1971). Each case must turn on its own circumstances. Here, the judge injected himself into the trial throughout the entire proceeding. Chief Justice Hughes observed in *Quercia v. United States, supra*, 289 U.S. at 470, 53 S.Ct. at 699, that a judge's

privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses. The influence of the trial judge on the jury "is necessarily and properly of great weight" and "his lightest word or intimation is receiving with deference, and may prove controlling." . . . *Starr v. United States*, 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841.

This record leaves me with the firm impression that as a result of the trial judge's comments the defendants did not receive a fair trial. I would therefore reverse and remand for a new trial.[2] See *Agee v. Lofton*, 287 F.2d 709 (8th Cir. 1961) (per curiam).

1. The trial judge had told the jury panel during voir dire that he had served as United States Attorney (Tr. 7).

2. What was said in *Egan v. United States*, 287 F. 958, 971 (D.C.Cir.1923), is apt here: "While there is perhaps no single instance involving

error so prejudicial as to warrant reversal, we are convinced that, considered as a whole, the rights of defendant were so prejudiced [by the judge's demeanor] as to deprive him of that fair and impartial trial which the Constitution and the law of the land accords to every citizen accused of the commission of crime."

I recognize that these are matters of judgment and degree, as to which reasonable judges may and do differ. The case against defendants was strong, and I agree that the Court has properly rejected the other points urged for reversal. My thoughts about this case, however, keep turning to the same point: that in a civilized system of justice, few if any values are more important than fairness, and the appearance of fairness, in judges. Because my review of the entire record has convinced me that the conduct of this trial fell below the Plimsoll line[3] of fairness and the appearance of fairness, I respectfully dissent in part.

---

**3.** See *Fikes v. Alabama*, 352 U.S. 191, 198, 199, 77 S.Ct. 281, 285–286, 1 L.Ed.2d 246 (1957) (Frankfurter, J., joined by Brennan, J., concurring).