# Illinois Official Reports

## Appellate Court

<div style="border:1px solid">

### *People v. Neal*, 2020 IL App (4th) 170869

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. CHRISTOPHER L. NEAL, Defendant-Appellee. |
| District & No. | Fourth District<br>No. 4-17-0869 |
| Filed<br>Rehearing denied | June 29, 2020<br>August 3, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Macon County, No. 15-CF-1065; the Hon. Jeffrey S. Geisler, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, John M. McCarthy, Catherine K. Hart, and Edward J. Wittrig, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Jay Scott, State's Attorney, of Decatur (Patrick Delfino, David J. Robinson, and James C. Majors, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

Panel           PRESIDING JUSTICE STEIGMANN delivered the judgment of the court, with opinion.

Justices Knecht and Cavanagh concurred in the judgment and opinion.

## OPINION

¶ 1      In September 2015, the State charged defendant, Christopher L. Neal, with four felony offenses involving illegal drugs. In November 2016, a jury convicted defendant on two of the drug charges. The trial court later sentenced him to 18 years in prison on one charge and 2 years in prison on the other, and it ordered those sentences to be served concurrently.

¶ 2      Defendant appeals and makes the following arguments.

¶ 3      First, defendant contends he was denied his right to the effective assistance of counsel because his trial counsel failed to object to the admission of certain incriminating documents that constituted inadmissible hearsay. Specifically, defendant claims that (1) a phone bill with his name and the address of the residence where the drugs were found and (2) an unopened envelope addressed to him at that same residence were hearsay statements used to prove he lived at the residence. As a matter of first impression in Illinois, we hold that implied assertions of fact contained within mail and other documents are not hearsay.

¶ 4      Second, defendant argues the prosecutor's improper closing argument denied him a fair trial. However, after reviewing the arguments made by defense counsel, we conclude that (1) her argument clearly invited a response and (2) the prosecutor's rebuttal arguments were appropriate.

¶ 5      Third, defendant asserts the trial court erred because it did not properly admonish potential jurors as required by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Defendant recognizes he did not object to the improper admonishments but maintains the court committed plain error. We reject defendant's argument because the evidence against him was overwhelming.

¶ 6      Fourth, defendant argues that the trial court improperly conducted a *Krankel* hearing. See *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). We conclude that the trial court (1) properly conducted the hearing and (2) committed no error when it declined to appoint new counsel.

¶ 7      Accordingly, we affirm the trial court's judgment.

¶ 8                      I. BACKGROUND

¶ 9                      A. The Charges Against Defendant

¶ 10     In September 2015, the State filed the following drug charges against defendant:

Count I: Unlawful possession of a controlled substance with intent to deliver with a prior unlawful possession of a controlled substance with intent to deliver (specifically, more than 600 but less than 1500 objects containing Methylenedioxymethamphetamine (Ecstasy)) (720 ILCS 570/401(a)(7.5)(C)(ii), 408 (West 2014)).

Count II: Unlawful possession of a controlled substance with intent to deliver with a prior unlawful possession of a controlled substance with intent to deliver conviction

(more than 15 grams but less than 100 grams of a substance containing heroin) (*id.* §§ 401(a)(1)(A), 408).

Count V: Unlawful possession of a controlled substance with a prior unlawful possession of a controlled substance with intent to deliver conviction (specifically, more than 600 but less than 1500 objects containing Ecstasy) (*id.* §§ 402(a)(7.5)(C), 408).

Count VI: Unlawful possession of a controlled substance with a prior unlawful possession of a controlled substance with intent to deliver conviction (15 grams or more, but less than 100 grams of a substance containing heroin) (*id.* §§ 402(a)(1)(A), 408).

The State's original charges also included two charges of unlawful possession of a weapon by a felon, but prior to trial, the trial court granted defendant's motion to sever those counts from the drug counts. After defendant was convicted of the drug charges, the State dismissed the gun charges.

¶ 11 In November 2016, the State filed a motion to amend counts I and V of the information, explaining that it had originally filed those counts under the belief that the controlled substance in question was Ecstasy but later received a lab report stating the substance in question was identified as a different illegal controlled substance under Illinois law, namely, 4-chloro-2, 5-dimethoxy-N-((2-methoxyphenyl)methyl)-benzeneethanamine, otherwise known as 25C-NBOMe.

¶ 12 The trial court granted the State's motion over defendant's objection, and both counts were amended accordingly. When granting that motion, the court noted that a factual issue may arise for the jury to decide "if there is one lab report that says one thing, and then a year later, another lab report that says something different." Accordingly, the court informed defendant's counsel, who was privately retained, that if she "[wished] to have an independent investigation or independent lab [examine the drugs], I certainly think that is also something that should be allowed."

¶ 13 In February 2017, defense counsel informed the trial court that she had looked into an independent lab to test the pills that were at issue in this case. She had found a lab, but because (1) it did not have a proper certification and (2) the cost was "just going to be prohibitive," she was going to announce ready for trial.

¶ 14 **B. The Evidence at Defendant's Trial**

¶ 15 In June 2017, defendant's case proceeded to a jury trial. The charges in this case arose from the execution of a search warrant on August 26, 2015, in Decatur, Illinois. The search warrant authorized the search of defendant's person as well as the building at 1344 East Division Street in Decatur (hereinafter, "the residence"), which was a single-family residence.

¶ 16 *1. The Search of Defendant*

¶ 17 On the afternoon of August 26, 2015, several Decatur police officers watched the residence. They had seen defendant come and go from the residence earlier that day, as well as the day before. Around 2:30 that afternoon, the officers watched defendant get into his vehicle, which was parked in the residence driveway, and drive away. They followed him for a few minutes and then made a traffic stop. Defendant was the only one in the vehicle.

¶ 18    The police explained to defendant that they had a warrant to search both his person and the residence. They searched him for any weapons or contraband, found none, and then handcuffed his hands behind his back. They then told defendant they were going to transport him to the Decatur police station.

¶ 19    One of the officers who stopped defendant, Detective Jason Hesse, had a body camera, which was operating during the traffic stop, and the footage from that camera was admitted into evidence and shown to the jury. Hesse explained to defendant that they had a search warrant both for his person and the residence. Hesse told defendant, "You were at 1344 East Division." Defendant responded, "No, I wasn't. No, I wasn't."

¶ 20    Defendant had clipped to his pants on his right hip, near his pocket, a "phone holster" that contained a cell phone. Although the officers saw the phone in the holster, they did not seize it at the traffic stop, and it remained on defendant's person until he arrived at the Decatur police station.

¶ 21    The video from Hesse's body camera showed that defendant was placed in handcuffs and seated in the front seat of their squad car. The front passenger door of the squad car was open for several minutes as the officers conversed with defendant. The video showed defendant adjusting himself in the front seat. Of importance for later events, the video also clearly showed that although defendant's hands were handcuffed behind his back, he was able to move his right hand to the area of the holstered cell phone, and he almost completely covered the holster when he did so.

¶ 22    Detective Jonathan Roseman transported defendant in Roseman's squad car from the traffic stop to the Decatur police station. They were the only ones in the car during the 11-minute ride, and what happened was captured with audio and video recording equipment in the vehicle. The video was played for the jury, and at one point Roseman can be heard saying to defendant, "What are you looking at?" Roseman testified that he made that statement because he could hear a clicking noise that he believed was coming from defendant's handcuffs, given that defendant was "moving around quite a bit."

¶ 23    Roseman also testified that, because defendant was looking down at his right thigh area at the same time Roseman heard the clicking noises, Roseman was concerned that defendant was slipping out of his handcuffs. Roseman explained that defendant had earlier complained about the handcuffs being too tight, but Roseman testified he had properly fit them on defendant.

¶ 24    During the drive to the police station, defendant told Roseman that the residence was not his but that he knew children were present in the house, and he provided their ages.

¶ 25    After they arrived at the police station, Roseman did not search defendant again or remove any property from his person. Roseman did not remove the cell phone from the holster, nor did he put the cell phone in defendant's right front pants pocket. However, Roseman did not recall seeing defendant do that either.

¶ 26    At the police station, Hesse removed the cell phone from defendant's person, which was a black "flip phone," but when Hesse did so, the phone was then located in defendant's front right pants pocket. Only Hesse, Roseman, and defendant had had access to that cell phone from the time of the traffic stop until Roseman delivered defendant to the police station, at which point Hesse took possession of the phone.

¶ 27    Hesse testified that he did not place defendant's cell phone in defendant's right front pants pocket. Even though Roseman and Hesse saw defendant's cell phone in the phone holster,

neither officer seized the holster, and at the time of trial, neither could account for what happened to it.

¶ 28    When searching defendant at the police station, Hesse took possession of defendant's wallet. It contained a real estate business card that had handwriting on the back that, as Hesse described it, "said something to the effect of Christopher Neal paid $450 for rent for 1344 East Division for November." Hesse also found $1097 on defendant's person.

¶ 29                    2. *The Search of the Residence*

¶ 30    After learning that defendant's vehicle had been stopped, other Decatur police officers went to the residence to execute the search warrant. The only persons (other than the police) present in the residence that afternoon were Kyra Walker and her two very young children.

¶ 31    The residence contained surveillance cameras set up to monitor its front door and its driveway. Officers searched the freezer area of the refrigerator and, behind the ice maker, found a "baggie" containing five smaller baggies that each contained heroin. In the broiler drawer under the stove, they located four smaller baggies containing pills. The officers separated the baggies from the pills and the heroin so the baggies could be tested for fingerprints. Other officers found three bags containing a large number of pills in a floor vent in the living room. The police also recovered baggie corners and a digital scale from within the residence.

¶ 32    In one of the bedrooms, the officers found a 9-millimeter pistol on a dresser, a .25-caliber pistol on the floor by the head of the bed, and a box of ammunition.

¶ 33    The police searched Walker's purse in the living room and found three documents in it: (1) an AT&T phone bill dated August 3, 2015, in the name of Christopher Neal at the address of 1344 East Division Street, Decatur, Illinois, that stated it was page "3 of 3" but did not set forth an amount due; (2) an unopened envelope from American Family Insurance addressed to Christopher Neal at that same address; and (3) a copy of a warranty deed for the residence. The warranty deed showed that the residence was conveyed to defendant on February 20, 2015, and it had been recorded in the Macon County Recorder of Deeds office on April 21, 2015.

¶ 34    The police also recovered two cell phones from the residence and observed adult men's clothing in one of the bedroom closets.

¶ 35                    3. *Kyra Walker's Testimony*

¶ 36    Walker testified as a State's witness and explained that she was in a "dating relationship" with defendant when the police searched the residence on August 26, 2015, but she no longer was at the time of the June 2017 jury trial. Walker testified that, on that date, she was living at the residence with defendant and her two young children. Defendant was the father of one of those children. Walker further testified that the police found illegal drugs during the search and that the drugs belonged to defendant.

¶ 37    Walker stated she was arrested on the day of the search. At the scene, she told the police that she did not know anything and had nothing to say to them. Five weeks later, as Walker remained in custody hoping that someone was going to come and bond her out, she decided to talk to the police with her lawyer present. Pursuant to a plea agreement, Walker agreed to testify at defendant's trial. In exchange for her testimony, she would plead guilty to a Class 4

felony for a sentence of probation, and the State would dismiss all of the other charges against her.

¶ 38    Walker acknowledged that she was testifying pursuant to her plea agreement, and the record reveals she was a reluctant witness. When pressed, Walker admitted that she once "gave somebody something that [defendant] gave me," but she was "not comfortable answering" whether defendant personally gave her what she believed to be some kind of illegal drugs or pills to deliver to another person because she never got anything in return for doing so.

¶ 39    Walker testified that defendant had another house at 1802 North Morgan Street in Decatur, where he stayed with his cousin. Nonetheless, defendant bought the house at 1344 East Division, and she, defendant, and her children lived there.

¶ 40    On cross-examination, defense counsel asked Walker the following question: "And so [defendant] bought the house at 1344 East Division, but you live there?" Walker responded, "That's not correct. *We both live there.*" (Emphasis added.) Walker acknowledged that, on the date of her arrest, she told the police that, even though mail was found in defendant's name at the residence, he did not live with her.

¶ 41                                        4. *The Text Messages*

¶ 42    Detective David Dailey of the Decatur Police Department testified as an expert witness that he examined defendant's cell phone along with the two cell phones taken from the residence. He explained that he was a certified cellular phone physical analysist, which meant that he was certified to operate software that enables information to be extracted from cell phones or other electronic devices. Dailey further explained that an "extraction" takes information out of the device being examined but does not alter the information. Dailey successfully made extractions from defendant's phone and from one of the cell phones in the residence. The information he extracted was essentially text messages.

¶ 43    Dailey testified about several incoming and outgoing texts, as well as the contact names for those texts, on defendant's phone. One such text, received while defendant was in custody at the police station at 4:23 p.m., read as follows: "Hey, you wouldn't do two for 30." After the trial court permitted Dailey to testify as an expert regarding the trafficking of illegal drugs, he testified that based upon his experience, the text was referring to a dosage unit of heroin being 0.1 gram that would cost the individual approximately $20. In Dailey's opinion, the person sending the text message was "trying to get a deal—they're trying to get two .1 grams for $30 instead of $40."

¶ 44    Dailey next testified about three texts that were sent while defendant was in custody in Roseman's squad car, being driven from the traffic stop to the Decatur police station. The first was an outgoing text from defendant's phone sent at 2:51 p.m. to "Little Bruh," which read, "They got me, them people." Dailey testified that "them people" meant the police.

¶ 45    Dailey testified that a text message was sent to the contact name of "Wifee" from defendant's cell phone at 2:47 p.m. that said, "get everything out of the house now." Dailey said an additional text message was sent two minutes later from defendant's phone, again to "Wifee," and its sole content was "flush it." Both of these text messages to "Wifee" were also sent while defendant was in police custody.

¶ 46    Dailey testified that a contact named "Old Man" sent defendant a text message on August 26, 2015, at 10:42 a.m. (about four hours before defendant's arrest), stating "510 for 3?" Dailey

explained this text as follows: The numbers "510 for 3" meant the texter was asking if he could get "5 dimes" of heroin, which would normally cost $50, for $30.

¶ 47    Another text message was sent from defendant's phone to a contact name of "Michele" on August 25, 2015, at 10:06 a.m., the day before defendant was arrested. The text stated, "meet me on Olive Street." Dailey explained that drug sellers commonly do not like customers to come to their residences because that is "where they store their stash" and it leaves them vulnerable "to being ripped-off or having their residence broken into." Dailey opined that (1) defendant in that text message was telling the contact Michele to meet him on Olive Street and (2) he was going to travel there to do some type of transaction.

¶ 48    Dailey testified that the text messages sent to "Wifee" showed up as unread on one of the cell phones found in the residence. Dailey added that defendant's cell phone had 32 text messages extracted from it, but Dailey testified about only 7 of them. The others were not relevant to the charges against defendant.

¶ 49    Finally, Dailey testified that in the business of trafficking in heroin, in his expert opinion, 50 grams of heroin would have been worth $10,000 in August 2015. He also testified that the amount of heroin recovered from the residence was consistent with distribution, not personal use.

¶ 50              5. *The Drugs and Fingerprint Expert Testimony*

¶ 51    Julia Edwards testified that she worked for the Illinois State Police as a forensic scientist analyzing suspected narcotics. She determined that one of the substances submitted to her in this case weighed 41.4 grams and contained heroin. Another substance submitted to her weighed 10.1 grams and contained both heroin and cocaine.

¶ 52    When Edwards initially tested another item she received, multicolored tablets, she first saw an indication for 25C-NBOMe. However, after further testing, she was unable to say to a scientific certainty that the substance was in fact 25C-NBOMe. Because the large quantity of heroin was a much more serious offense, she did not continue testing the suspected 25C-NBOMe.

¶ 53    Edwards testified that, nearly a year after her initial test of these substances, the prosecutor in this case had a phone conversation with her in which he asked her to conduct additional testing. She did so and was then able to confirm that the tablets she was testing did contain 25C-NBOMe. She was able to make that determination because she used a "different type of extraction technique."

¶ 54    On cross-examination, defense counsel rigorously questioned Edwards about (1) how and why Edwards performed a second test of those tablets and found they contained 25C-NBOMe and (2) her conversation with the prosecutor in which he requested that second test. In defense counsel's questioning, counsel pointed out that Edwards was done with the pills in question after the first round of testing and did not suggest to the prosecutor either that the pills be resubmitted for further testing or that a different test would get "a better result."

¶ 55    Another forensic scientist working for the Illinois State Police, who was a specialist in latent fingerprints, testified regarding her examination of two guns and three plastic bags submitted by the Decatur police. She could not obtain any fingerprints off the guns but did obtain a latent fingerprint off one of the bags that matched defendant.

¶ 56                              6. *Defendant's Evidence*

¶ 57    Defendant did not testify, but the parties agreed to a stipulation that defendant was on parole in August 2015 and was required to provide his address to his parole officer, Bill Cooper. The address defendant provided to Cooper was 1802 North Morgan Street in Decatur. The stipulation added that Cooper visited defendant at that address several times before defendant's arrest on August 26, 2015, and some of those visits were unannounced and unscheduled. On those visits, Cooper went inside the Morgan Street residence and could see that the house was fully furnished and appeared to be lived in.

¶ 58                              C. The Jury's Verdict

¶ 59    At the close of the State's case, defendant moved for a directed verdict, and the trial court granted it with regard to count I, possession with intent to deliver 25C-NBOMe. The court denied the motion with regard to possession of that substance (count V) and possession of heroin with intent to deliver (count II).

¶ 60    The jury found defendant guilty of possession of heroin with the intent to deliver between 15 and 100 grams of a substance containing heroin (count II) and possession of 25C-NBOMe (count V).

¶ 61                              D. Posttrial Matters

¶ 62    After trial, defense counsel sought to withdraw, alleging an irretrievable breakdown of the attorney-client relationship and pointing out that defendant had filed a complaint against her with the Attorney Registration and Disciplinary Commission. After hearing of defendant's claim that his counsel was ineffective, the trial court ordered defendant to put his claims in a written motion and stated that it would then conduct a *Krankel* hearing.

¶ 63    Defendant did so and alleged that defense counsel failed to (1) call certain witnesses, including his parole agent, Bill Cooper, to testify, (2) sufficiently investigate Walker, (3) challenge the search warrant, (4) retest the pills despite her receiving money from defendant's family to do so, and (5) file a pretrial motion to disclose an informant's identity. Defendant requested the appointment of the public defender's office.

¶ 64    The trial court later conducted a *Krankel* hearing at which defense counsel addressed the various claims defendant made in his *pro se* motion. Defendant also discussed these claims in detail with the court. At the conclusion of the *Krankel* hearing, the court determined that (1) trial counsel had been highly competent in her handling of defendant's case and (2) the court would not find that she had been ineffective. The court then denied defense counsel's motion to withdraw.

¶ 65    Defendant's trial counsel then filed a motion for new trial challenging only the sufficiency of the evidence. The trial court denied the motion and later sentenced defendant to 18 years in prison on count II and 2 years in prison on count V, with those sentences to be served concurrently. The State dismissed the remaining gun charges.

¶ 66    This appeal followed.

¶ 67                                    II. ANALYSIS

¶ 68        Defendant appeals, arguing that (1) he was denied his right to the effective assistance of
counsel because his trial counsel failed to object to the admission of certain incriminating
exhibits that constituted inadmissible hearsay, (2) he was denied a fair trial based upon the
prosecutor's improper closing arguments, (3) the trial court erred because it did not properly
admonish potential jurors under Rule 431(b), and (4) the trial court improperly conducted a
posttrial *Krankel* hearing. We disagree and affirm. We discuss defendant's claims in turn.

¶ 69            A. Defendant's Claim That Counsel Was Ineffective for Failing to Object
                  to Documents That Constituted Inadmissible Hearsay

¶ 70        Defendant first argues that he was denied his right to the effective assistance of counsel
because his trial counsel failed to object to the admission of certain documents that contained
inadmissible hearsay. The documents in question (hereinafter, "the documents") are (1) page
"3 of 3" of an AT&T bill dated August 3, 2015, in the name of Christopher Neal at the address
of 1344 East Division Street, Decatur, Illinois, that did not set forth an amount due and (2) an
unopened envelope from American Family Insurance showing that it was mailed to defendant
at the same address. During the execution of the search warrant at the residence, officers found
these documents in Walker's purse in the living room.

¶ 71        Defendant contends that they contained hearsay and were improperly used by the State for
the truth of the matter asserted therein—specifically, that defendant lived at 1344 East Division
Street in Decatur in August 2015. Defendant points out that, because this is a constructive
possession case, the State needed to prove that he had knowledge of the presence of the illegal
drugs at the residence where he could exercise immediate and exclusive control. *People v.
Loggins*, 2019 IL App (1st) 160482, ¶¶ 45-47, 130 N.E.3d 432. Defendant also points out that,
in the prosecutor's closing argument, he said police officers found "an AT&T bill from August
2015, this raid happened in August 2015, with the defendant's name on it. He is connected to
that house." Defendant concludes by arguing his trial counsel was ineffective for failing to
object to the admission of the documents.

¶ 72        We disagree with defendant's argument and conclude, as a matter of first impression in
Illinois, that these documents are not hearsay. Specifically, we hold that implied assertions of
fact contained within mail and other documents are not hearsay. Because the documents were
properly admitted, defendant's trial counsel was not ineffective based on the claim that she did
not object to them.

¶ 73                   1. *Are Mail and Other Documents Containing Implied
                          Assertions of Fact Hearsay?*

¶ 74        At issue in this case is the admissibility of mail bearing defendant's name that was
addressed to him at an address where the mail was found. The mail bearing defendant's name
and address constituted implied assertions of fact. The question is whether that mail was
admissible to link defendant to those premises. The fundamental issue underlying this question
is whether mail and other documents containing implied assertions of fact are hearsay. This
issue is one that courts in this nation and the United Kingdom have wrestled with for—
literally—almost 200 years (see *Wright v. Tatham* (1837), 112 Eng. Rep. 488, 7 Ad & E 313),

and its resolution requires an analysis of the basic principles of the rules of evidence dealing with hearsay.

¶ 75　　　In our analysis of this issue, we will discuss the following topics: (1) the Federal Rules of Evidence and the advisory committee's notes (Advisory Committee Notes), (2) the Illinois Rules of Evidence, (3) state cases holding that implied assertions of fact contained within mail and other documents are not hearsay, (4) federal cases holding that implied assertions of fact contained within mail and other documents are not hearsay, (5) analysis of this issue by legal scholars and commentators, and (6) Illinois cases that have indirectly addressed this issue. We then state our conclusion, which is that implied assertions of fact contained within mail and other documents are not hearsay, and we explain why we reached that conclusion. After doing so, we (1) discuss the Illinois Rules of Evidence Committee Commentary, (2) explain that our conclusion is consistent with Illinois caselaw, (3) state that our conclusion reflects sound policy considerations, (4) explain the limited scope of our conclusion, and (5) discuss contrary authority.

¶ 76　　　　　　　　a. The Federal Rules of Evidence and the Federal Rules of
Evidence Advisory Committee

¶ 77　　　In 1975, the Federal Rules of Evidence were promulgated. Since that time, they have been an important point of reference for rules of evidence that various states, like Illinois, have adopted. Federal Rule of Evidence 801(a)-(c) reads as follows:

"(a) Statement. 'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion.

(b) Declarant. 'Declarant' means the person who made the statement.

(c) Hearsay. 'Hearsay' means a statement that:

(1) the declarant does not make while testifying at the current trial or hearing; and

(2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(a)-(c).

¶ 78　　　Prior to the 1975 adoption of the Federal Rules of Evidence, the Advisory Committee on the Federal Rules of Evidence, Judicial Conference of the United States (Advisory Committee), provided an analysis of the then-forthcoming rules, explaining, in part, how to construe Federal Rule of Evidence 801(a). Courts view the Advisory Committee Notes as important and persuasive. *Tome v. United States*, 513 U.S. 150, 160 (1995) ("We have relied on those well-considered Notes as a useful guide in ascertaining the meaning of the Rules. [Citations.] *** The Notes are also a respected source of scholarly commentary."). Because Advisory Committee Notes are important in construing such rules, we set forth in their entirety the 1972 Advisory Committee Notes regarding then-proposed Federal Rule of Evidence 801(a):

"Note to Subdivision (a). The definition of 'statement' assumes importance because the term is used in the definition of hearsay in subdivision (c). *The effect of the definition of 'statement' is to exclude from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion. The key to the definition is that nothing is an assertion unless intended to be one.*

It can scarcely be doubted that an assertion made in words is intended by the declarant to be an assertion. Hence verbal assertions readily fall into the category of 'statement.' Whether nonverbal conduct should be regarded as a statement for purposes of defining hearsay requires further consideration. Some nonverbal conduct, such as the act of pointing to identify a suspect in a lineup, is clearly the equivalent of words, assertive in nature, and to be regarded as a statement. Other nonverbal conduct, however, may be offered as evidence that the person acted as he did because of his belief in the existence of the condition sought to be proved, from which belief the existence of the condition may be inferred. This sequence is, arguably, in effect an assertion of the existence of the condition and hence properly includable within the hearsay concept. [Citations.] Admittedly evidence of this character is untested with respect to the perception, memory, and narration (or their equivalents) of the actor, but the Advisory Committee is of the view that these dangers are minimal in the absence of an intent to assert and do not justify the loss of the evidence on hearsay grounds. No class of evidence is free of the possibility of fabrication, but the likelihood is less with nonverbal than with assertive verbal conduct. The situations giving rise to the nonverbal conduct are such as virtually to eliminate questions of sincerity. Motivation, the nature of the conduct, and the presence or absence of reliance will bear heavily upon the weight to be given the evidence. [Citation.] Similar considerations govern nonassertive verbal conduct and verbal conduct which is assertive but offered as a basis for inferring something other than the matter asserted, also excluded from the definition of hearsay by the language of subdivision (c).

When evidence of conduct is offered on the theory that it is not a statement, and hence not hearsay, a preliminary determination will be required to determine whether an assertion is intended. The rule is so worded as to place the burden upon the party claiming that the intention existed; ambiguous and doubtful cases will be resolved against him and in favor of admissibility. The determination involves no greater difficulty than many other preliminary questions of fact." (Emphasis added.) Fed. R. Evid. 801(a), Advisory Committee Notes (1972 Proposed Rules).

### b. The Illinois Rules of Evidence

In 2011, the Illinois Supreme Court promulgated the Illinois Rules of Evidence, which, like our sister states in their rules of evidence, track the Federal Rules of Evidence very closely. Illinois Rule of Evidence 801(a)-(c) (eff. Oct. 15, 2015) reads as follows:

"The following definitions apply under this article:

(a) Statement. A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.

(b) Declarant. A 'declarant' is a person who makes a statement.

(c) Hearsay. 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

¶ 81                 c. State Cases Holding That Implied Assertions of Fact Contained
Within Mail and Other Documents Are Not Hearsay

¶ 82       Illinois courts have not directly addressed the issue before us. However, some state courts have and have concluded that implied assertions of fact contained within mail and other documents are not hearsay. In *State v. Peek*, 365 S.E.2d 320, 322 (N.C. Ct. App. 1988), the defendant was convicted of various drug offenses after the police searched a single-family residence in Charlotte, North Carolina, and found drugs inside. The defendant argued on appeal that the trial court erred by allowing into evidence copies of several pieces of mail addressed to her at that address. *Id.* She claimed that, because they were offered to prove that she lived at that address, the mail was inadmissible hearsay. *Id.* The North Carolina Court of Appeals disagreed and wrote the following:

> "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted. [Citations.] A 'statement' is either (1) an oral or written assertion, or (2) non-verbal conduct which is intended as an assertion. [(The court of appeals here referred to North Carolina Rule of Evidence 801(a). N.C. Gen. Stat. § 8C-1, Rule 801(a)-(c) (1988)).] Defendant's name and address, written or printed on an envelope or its contents, is neither a written assertion nor conduct which is intended as an assertion and, therefore, is not hearsay evidence.
>
> On its face, a written or printed name and address on an envelope asserts nothing. From the sender's conduct in writing or affixing the name and address and mailing the material so addressed, however, it may be inferred that the sender believes the person named lives at that address. As the Commentary to [North Carolina Rule of Evidence 801] makes clear, conduct 'offered as evidence that the person acted as he did because of his belief in the existence of the condition sought to be proved' is not a statement. Although evidence of the sender's conduct remains untested as to perception, memory, and narration, those 'dangers are minimal in the absence of an intent to assert, and do not justify the loss of the evidence on hearsay grounds.' [Citations.] The sender's conduct in addressing and mailing the envelope undoubtedly implies that the sender believes the addressee lives at that address. Nevertheless, because no assertion is intended, the evidence is not hearsay and is admissible. See *United States v. Singer*, 687 F.2d 1135 (8th Cir.1982)." *Id.*

¶ 83       The North Carolina Rule of Evidence 801(a)-(c) cited in *Peek*, in pertinent part, is identical to the Illinois rule and reads as follows:

> "(a) Statement.—A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion.
>
> (b) Declarant.—A 'declarant' is a person who makes a statement.
>
> (c) Hearsay.—'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. Ann. § 8C-1, Rule 801(a)-(c) (West 2019).

¶ 84       The *Peek* court also cited the commentary regarding North Carolina Rule of Evidence 801 in support of its decision. *Peek*, 365 S.E.2d at 322. That commentary is essentially the same as the Advisory Committee Notes of 1972 regarding the then-proposed Federal Rule of Evidence 801, which makes sense, given that North Carolina Rule of Evidence 801 is essentially the

same as Federal Rule of Evidence 801. See N.C. Gen. Stat. Ann. § 8C-1, Rule 801, Commentary (West 2019). However, the North Carolina commentary adds the following clarification: "Subdivision (a) differs from current North Carolina law by excluding from the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion." *Id.*

¶ 85    In further support of its decision (*Peek*, 365 S.E.2d at 322), the *Peek* court cited McCormick on Evidence § 250 (Edward W. Cleary ed., 3d ed. 1984), which states the following:

"The Federal Rule [(801(a))] *** requires that nonverbal conduct must be intended to be an assertion if it is to be classed as hearsay.

***

Even though the risks arising from purposeful deception may be slight or nonexistent in the absence of intent to communicate, the objection remains that the actor's perception and memory are untested by cross-examination for the possibility of honest mistake. However, in contrast to the risks from purposeful deception[,] those arising from the chance of honest mistake seem more sensibly to be factors useful in evaluating weight and credibility rather than grounds for exclusion." *Id.* § 250, at 738-39.

¶ 86    In *Shurbaji v. Commonwealth*, 444 S.E.2d 549, 550-51 (Va. Ct. App. 1994), the defendant argued that the trial court erred by admitting into evidence utility bills addressed to him found in the master bedroom where cocaine was also found. He contended that those documents constituted written hearsay and were inadmissible absent a business records foundation. *Id.* The Virginia Court of Appeals disagreed and wrote the following:

"To constitute hearsay[,] the documents must be 'written evidence[ ] of a statement made out of court, the statement being offered as an assertion *to show the truth of matters asserted therein*, and thus resting for its value upon the credibility of the out-of-court asserter.' [Citation.] The challenged documents in this case were *not* offered for the truth of the matter asserted therein. The utility bills were used as circumstantial evidence that appellant received or stored his property, including his correspondence, in the master bedroom. It was irrelevant what the utility bills 'asserted therein.' Rather, the mere existence of the bills in the master bedroom tended to prove that appellant controlled the room, and that the cocaine and paraphernalia found there belonged to him." (Emphases in original.) *Id.* at 551.

¶ 87    In *State v. Miller*, 106 P.3d 474, 475 (Idaho Ct. App. 2004), the defendant claimed that a receipt with her name on it, which was found in a package containing methamphetamine, was improperly introduced because it constituted inadmissible hearsay. The Idaho Court of Appeals disagreed and explained as follows:

"[T]he district court correctly overruled [the defendant's] hearsay objection because the receipt was not offered 'for the truth of the matter asserted' and therefore did not meet the definition of hearsay for purposes of this trial. The receipt, taken as a whole, does constitute an assertion that a specified sum had been paid by [the defendant] ***. The receipt was not offered by the State to prove such payment, however. Whether [the defendant] had actually made the indicated payment was irrelevant and of no consequence to the State in this prosecution. Rather, the receipt bearing [the defendant's] name was used as circumstantial evidence tying her to the methamphetamine that was wrapped within the receipt. This case involved the issue of

constructive possession, which required that the State show a 'nexus between the accused and the substance ***.' [Citations.] The receipt that formed the bindle was evidence of the necessary nexus between the methamphetamine and [the defendant]." *Id.* at 475-76.

¶ 88    In reaching this decision, the Idaho court cited approvingly the decisions of the Second Circuit Court of Appeals in *United States v. Mejias*, 552 F.2d 435 (2d Cir. 1977), and the Fifth Circuit Court of Appeals in *United States v. Mazyak*, 650 F.2d 788 (5th Cir. 1981), which we discuss later in this opinion. See *Miller*, 106 P.3d at 476.

¶ 89    In *State v. Sedillo*, 2014-NMCA-039, ¶¶ 2-3, 321 P.3d 152, the issue was the admissibility of documents found in the bedroom of the defendant's father's home where methamphetamine was also found during a search. The State claimed that the bedroom was under the defendant's control and sought to establish that by introducing two documents relating to telephone service. *Id.* ¶ 3.

¶ 90    The first document in question, which was in the same colors, font, and style as a telephone bill, stated, "Congratulations Lawrence Sedillo! You are done! Turn off your handset and turn it back on … Information below. You can print this page to keep as a record of this transaction." *Id.* ¶ 8. The second document informed an unidentified customer that he or she must pay $40 to avoid cancellation of telephone services. *Id.*

¶ 91    The New Mexico Court of Appeals held that the "correspondence documents were offered for another legitimate purpose other than to prove the truth of any statement contained therein and did not constitute inadmissible hearsay." *Id.* The court explained its reasoning, as follows:

> "The State did not intend to prove that [d]efendant was required to pay forty dollars in order to avoid cancellation of his telephone services or that [d]efendant was 'done' and could turn his handset off and then back on. Instead, the State sought to use the two telephone correspondence documents as personal records of the individual residing in the northwest bedroom of [d]efendant's father's house. The reasonable inferences that the State can ask the jury to draw from this circumstantial evidence are: (1) that this telephone customer—[d]efendant here—kept his personal telephone correspondence documents in the northwest bedroom of the house, and (2) that such personal correspondence was evidence that this telephone customer exercised control over the northwest bedroom where drugs were located.

> We have previously admitted similar evidence as non-hearsay when it was relevant to prove the separate and legitimate purpose of a defendant's exercise of control over a particular location where drugs are found." *Id.* ¶¶ 9-10.

¶ 92    In *State v. McCurry*, 582 S.W.2d 733, 734 (Mo. Ct. App. 1979), the defendant argued that the trial court erred by admitting a telephone bill that the police recovered during a search of a bedroom in the residence in which defendant allegedly lived. The telephone bill was addressed to the defendant at the address of the residence. *Id.* The defendant argued that the telephone bill was inadmissible hearsay, but the Missouri Court of Appeals disagreed, explaining as follows:

> "Defendant's reliance on the hearsay rule is misplaced. The telephone bill was not offered to show the truth of the matters asserted on the face of the bill. It was offered because it was a personal effect of the defendant and it was located in [a bedroom of the residence in which the defendant allegedly lived]. Since the amphetamine and the

- 14 -

marijuana were found in a jointly controlled residence, further evidence connecting the defendant with those illegal drugs was required. [Citation.] The telephone bill and the other personal effects of the defendant found in [that bedroom] were admissible to show that connection." *Id.*

¶ 93    In *Hernandez v. State*, 863 So. 2d 484, 486 (Fla. Dist. Ct. App. 2004), the defendant argued that the trial court improperly admitted an unopened letter addressed to him that was taken from his bedroom during a search thereof in which illegal drugs were found. The defendant argued that the envelope was inadmissible hearsay, being an out-of-court statement of the person who addressed the letter, which was offered to prove that the defendant lived at the residence where the drugs were found. *Id.* The appellate court held that the name and address on the envelope did not fall within the statutory definition of hearsay. *Id.*

¶ 94    The *Hernandez* court explained that, under Florida law, the definition of hearsay is a statement offered in evidence to prove the truth of the matter asserted. *Id.* (quoting Fla. Stat. § 90.801(1)(c) (2001)). The court noted that the Florida Evidence Code further defines a statement as " '[a]n oral or written assertion' " or " '[n]onverbal conduct of a person if it is intended by the person as an assertion.' " *Id.* (quoting Fla. Stat. § 90.801(1)(a) (2001)). The court explained, "Appellant's name and address printed on an envelope was not an assertion, nor was the placement of the name and address on the envelope nonverbal conduct intended as an assertion." *Id.* The *Hernandez* court cited approvingly the *Peek* decision from North Carolina and then concluded as follows:

> "It is also significant that the envelope was offered not to prove 'the truth of the matter asserted' under section 90.801(1)(c), but as circumstantial evidence that [the defendant] stored his property, including his correspondence, in the bedroom. The presence of the envelope in the bedroom tended to prove that appellant controlled the room, and that the contraband found there belonged to him." *Id.*

¶ 95    In *Carpenter v. State*, 15 N.E.3d 1075, 1076-78 (Ind. Ct. App. 2014), the most recent state case to address this issue, the defendant argued that mail addressed to him at the address where the police found illegal drugs was inadmissible hearsay. An exhibit was admitted in *Carpenter* that contained multiple pieces of mail addressed to the defendant at the address in question, including bills from a utility company and a health services provider. *Id.* at 1079. The Indiana Court of Appeals rejected the defendant's arguments, explaining as follows:

> "[The defendant] asserts the trial court abused its discretion when it admitted mail containing his name and address because it was hearsay. It was not.
>
> Hearsay is a statement (1) not made by the declarant while testifying at the trial or hearing; and (2) offered to prove the truth of the matter asserted. Ind. Evid. R. 801. 'To run afoul of the hearsay rule[,] the evidentiary purpose of the proffered statement must be the truth of the matter asserted.' [Citation.]" *Id.* at 1078.

¶ 96    In reaching this conclusion, the Indiana Court of Appeals noted that the issue was one of first impression in Indiana but that "a majority of the courts from other states that have considered the issue have held the prohibition against the admission of hearsay is not violated when mail found during an investigation is introduced at trial to demonstrate the defendant's name and address were on mail found in a specific location." *Id.* The Indiana Court of Appeals also cited approvingly the decisions in *Peek*, *Hernandez*, and *Shurbaji*. *Id.* at 1078-79.

¶ 97    d. Federal Cases Holding That Implied Assertions of Fact Contained
Within Mail and Other Documents Are Not Hearsay

¶ 98    Some federal appellate courts have also addressed the issue of the admissibility of mail and other documents sought to connect a person with particular premises and have concluded that this evidence is not hearsay. In *United States v. Mejias*, 552 F.2d 435, 446 (2d Cir. 1977), the defendant argued that his drug conviction should be reversed because the trial court improperly admitted a hotel receipt and a luggage invoice, seized from him after his arrest, over his objection that the government failed to lay a foundation for their admission as business records. The Second Circuit rejected these contentions and wrote the following:

> "These documents were not offered to prove either the payment of a hotel bill or the purchase of a piece of luggage, but were circumstantial evidence of [the defendant's] connection with the [hotel at issue] and the attach[é] case seized therefrom. *** Because these documents were not offered to prove the truth of their contents, they were not hearsay, Fed. R. Evid. 801(c) ***." *Id.*

¶ 99    In *United States v. Mazyak*, 650 F.2d 788, 792 (5th Cir. 1981), the defendants argued that their convictions should be reversed because the trial court improperly admitted various documents bearing the defendants' names and otherwise linking them to a boat and a particular hotel in Miami. The defendants claimed all of these documents, such as a receipt with one defendant's name on it for repair work performed for the boat on which drugs were found, constituted inadmissible hearsay. *Id.*

¶ 100    The Fifth Circuit rejected the defendants' claim and explained as follows:

> "[T]he government did not offer these documents to prove the truth of the matter asserted, *i.e.* that a payment for work repairs, hotel room, fuel, and equipment additions actually occurred. *** This court has affirmed the admission of a hotel receipt [and other documents] under virtually identical circumstances. *United States v. Mejias*, 552 F.2d 435, 446 ([2d] Cir. 1977)." *Id.*

¶ 101    In *United States v. Canieso*, 470 F.2d 1224, 1232 (2d Cir. 1972), the defendant argued that his drug conviction should be reversed because a letter taken from the person of his codefendant was erroneously admitted against the defendant in violation of the hearsay rule. The letter, which was not signed or dated, was found in the codefendant's wallet, and that letter "dovetailed" with other letters found on the defendant's person, which had been admitted against the defendant at trial. *Id.* The letter at issue, in part, contained instructions that, immediately upon arrival at a hotel, "the recipient should cable an address in Bangkok giving the name of the hotel, the number of the room, and the telephone number." *Id.*

¶ 102    The Second Circuit wrote the following:

> "We have some doubt whether the [codefendant's] letter is within the ban of the hearsay rule at all. It made no assertion about what the defendants had done; rather it told what they were to do. Its relevancy as against [defendant] was as circumstantial proof that he was linked with [the codefendant], the carrier of the narcotics, in much the same way as their common possession of cards giving the Bangkok cable address and the names of the prospective New York contacts would have done." *Id.*

The Second Circuit concluded that the resemblance of the letter found in the codefendant's wallet to the one found on the defendant's person afforded a strong basis for concluding that the codefendant's letter was admissible "*circumstantially*, as giving rise to indirect inferences,

but not as assertions to prove the matter asserted." (Emphasis in original and internal quotation marks omitted.) *Id.*

¶ 103 In *United States v. Triplett*, 855 F.2d 864 (9th Cir. 1988), an unpublished decision from the Ninth Circuit, the defendant argued that the trial court improperly admitted a check, a motel receipt, and a postal money order, all bearing his name, that should have been excluded as hearsay. Citing *Mejias*, the Ninth Circuit rejected this claim and wrote the following:

> "[T]he [trial] court did not admit these documents to prove that [the defendant] purchased something with the check, paid for the motel room, or sent the money order (*i.e.* for the truth of what the documents assert). Instead, the court admitted them as evidence that [the defendant] occupied the trailer [in question]. The documents are not hearsay by definition." *Id.*

¶ 104 In *United States v. Tin Yat Chin*, 371 F.3d 31, 35-36 (2d Cir. 2004), the defendant argued that the trial court erred by excluding, as inadmissible hearsay, certain receipts he had offered into evidence that he believed would be exculpatory. The Second Circuit agreed with the defendant, cited *Mejias* approvingly, and wrote the following: "When a category of writings does not trigger the traditional reliability concerns of hearsay—defects in memory, perception, narration, or sincerity—we have sanctioned their admissibility as 'non-hearsay.' " *Id.* at 38-39.

¶ 105 In *United States v. McIntyre*, 997 F.2d 687, 702 (10th Cir. 1993), the defendant argued that the trial court erred by admitting an American Express receipt, as well as testimony about other documents, because the evidence constituted inadmissible hearsay. The trial court reasoned that testimony regarding the documents and where they were found, if offered to link the defendants together and to certain locations, did not pose hearsay problems because the testimony was not offered for the truth of the matter asserted. *Id.* The Tenth Circuit agreed and wrote the following:

> "Although few courts have considered the issue in any detail, the overwhelming majority of courts, including several panels of this Circuit, have concluded with little discussion that circumstantial evidence is not hearsay under the Federal Rules of Evidence. Furthermore, academic and practical writings are in agreement that such evidence is not hearsay under the rules." *Id.* at 702-03.

¶ 106 We deem significant that the Tenth Circuit in *McIntyre* quoted the Advisory Committee Notes to then-proposed Federal Rule of Evidence 801(a) *in that note's entirety*, as this court similarly did earlier in this opinion. In doing so, the Tenth Circuit emphasized portions of the Advisory Committee Notes, as follows:

> " 'The situations giving rise to the nonverbal conduct are such as virtually to eliminate questions of sincerity. Motivation, the nature of the conduct, and the presence of absence of reliance will bear heavily on the weight to be given the evidence…. *Similar considerations govern nonassertive verbal conduct and verbal conduct which is assertive but offered as a basis for inferring something other than the matter asserted, also excluded from the definition of hearsay by the language of subdivision (c).*' " (Emphasis in *McIntyre*.) *Id.* at 704 (quoting Fed. R. Evid. 801(a), Advisory Committee Notes).

¶ 107 *McIntyre* concluded by noting the American Express receipt and the testimony about the other documents

- 17 -

"were introduced only to link various of the defendants together by the 'circumstance' that documents bearing the names of certain defendants or the location of certain drug transactions were found in [a codefendant's] possession. That testimony did not depend upon the truth of the assertions contained in the documents, and consequently we conclude such evidence was not hearsay as defined by [Federal Rule of Evidence] 801(c)." *Id.*

¶ 108   In *United States v. Singer*, 687 F.2d 1135, 1138 (8th Cir. 1982), the defendant argued that an incriminating letter was erroneously introduced because it was inadmissible hearsay. The letter was addressed to Joseph Sazenski and Carlos Almaden, 600 Wilshire, and contained a notice to terminate their tenancy. *Id.* at 1139-40. The government had offered the letter to show that "Carlos Almaden" lived with the defendant. *Id.* at 1147. The Eighth Circuit rejected the defendant's claim and, like the Tenth Circuit in *McIntyre*, quoted the Advisory Committee Notes to then-proposed Federal Rule of Evidence 801(a) that "[t]he effect of the definition of 'statement' is to exclude from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion." (Internal quotation marks omitted.) *Id.* The Eighth Circuit further explained, as follows:

> "If this letter were submitted to *assert* the implied truth of its *written contents*—that Carlos Almaden lived at 600 Wilshire—it would be hearsay and inadmissible. It is, however, admissible nonhearsay because its purpose is to imply from the landlord's *behavior*—his mailing a letter to 'Carlos Almaden,' 600 Wilshire—that 'Almaden' lived there. In addition, it is important that the letter was found in the residence at 600 Wilshire." (Emphasis in original.) *Id.*

¶ 109                                    e. Analysis by Legal Scholars and Commentators

¶ 110   For decades, legal scholars and commentators have studied and written about the issue this court is now addressing—namely, whether mail and other documents containing implied assertions are hearsay. The following are some examples.

> "[S]ince an implied assertion by definition consists of conduct *not* intended as an assertion concerning *f*, there is no danger that the actor is being insincere about *f*. A person who did not intend to make *any* statement about *f* could not have intended to make a misleading statement about *f*. Similarly, since the actor's conduct does not consist of words expressly stating *f*, there is no danger that language apparently affirming or denying *f*, and so understood by the fact finder, was in reality intended to convey a different meaning. In brief, while reliance on uncross-examined express assertions would expose the fact finder to the dangers of faulty narration, insincerity, inaccurate perception, and erroneous memory, only the perception and memory dangers seem to be posed by uncross-examined implied assertions. Because implied assertions entail fewer dangers than express assertions—especially because implied assertions raise no problems of insincerity—it is argued that they should be classified as nonhearsay." (Emphasis in original.) Ted Finman, *Implied Assertions as Hearsay: Some Criticism of the Uniform Rules of Evidence*, 14 Stan. L. Rev. 682, 685-86 (1962).

¶ 111   Another legal expert has written the following:

> "First, when a person acts in a way consistent with a belief but without intending by his act to communicate that belief, one of the principal reasons for the hearsay rule— to exclude declarations whose veracity cannot be tested by cross-examination—does

not apply, because the declarant's sincerity is not then involved. In the second place, the underlying belief is in some cases self-verifying:

> There is frequently a guarantee of the trustworthiness of the inference to be drawn \*\*\* because the actor has based his actions on the correctness of his belief, *i.e.*, his actions speak louder than words." Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence ¶ 801(a), at 801-61 to 801-62 (1st ed. 1990).

¶ 112 Other commentators have noted that the lack of intent to assert frees conduct from the hearsay rule and makes unintended implied assertions much less vulnerable than express assertions to the problems sought to be avoided by the hearsay rule. Judson F. Falknor, *The "Hear-Say" Rule as a "See-Do" Rule: Evidence of Conduct*, 33 Rocky Mt. L. Rev. 133, 136 (1961). In particular, the article contends that there is a reduced risk of bad faith in implied assertions when the declarant has no real intention of asserting a fact sought to be proved. *Id.*; see also Steven Goode and Olin Guy Wellborn III, Courtroom Evidence Handbook, 2011-2012 Student Edition 283 (2011) ("The hearsay rule is not violated if an out-of-court utterance is offered to prove a matter implied by, but not asserted in, the utterance.").

¶ 113 f. Relevant Illinois Cases

¶ 114 Over the years, some Illinois cases have indirectly addressed the issue now before this court. One such case is *People v. Stewart*, in which the defendant was convicted of murder and received the death penalty. *People v. Stewart*, 105 Ill. 2d 22, 57-58, 473 N.E.2d 840, 857-58 (1984), *abrogated on other grounds by People v. Gacho*, 122 Ill. 2d 221 (1988). In that case, some maids who cleaned the defendant's motel room after he departed found a laundry receipt on which "Stewart" was written. *Id.* at 57. The receipt was admitted into evidence and served to link the defendant to that room, which was important to the State's case. *Id.* at 57-58. The defendant argued the testimony concerning the receipt and the receipt itself were inadmissible hearsay. *Id.* at 57. The supreme court rejected that claim and the cases that the defendant cited in support, explaining as follows:

> "[T]he documents [in the cases the defendant cited] were offered to establish the truth of the matters asserted on the documents. [Citations.] In our case[,] the laundry receipt was not offered to prove that Stewart had his clothes cleaned at the particular laundry. This laundry receipt tended to link Stewart with room 22 of the Westward Motel and was but one link in a chain of investigative evidence \*\*\*. It is thus circumstantial evidence which, as stated in Wigmore's Treatise on Evidence, is not objectionable hearsay." *Id.* at 57-58.

¶ 115 In support of this conclusion, the supreme court favorably cited three opinions from federal courts of appeal that we earlier discussed: *Canieso*, *Mejias*, and *Mazyak*. Regarding the latter two cases, the supreme court noted that the documents in those cases were offered as circumstantial evidence linking the defendants to each other and a location and not for the truth of their contents. *Id.* at 58.

¶ 116 In *People v. Cruz*, 111 Ill. App. 3d 95, 101, 443 N.E.2d 769 (1982), the First District addressed the defendant's claim that the only piece of evidence tending to show his knowledge and control of the apartment in which illegal drugs were found was an electric bill found therein addressed to him. The First District noted, "It could be argued that the bill was not hearsay evidence if it were simply offered as circumstantial evidence that Cruz was receiving mail at

that address, from which it might be inferred that he resided there as well." *Id.* The case was ultimately decided on alternative grounds.

¶ 117    The Third District similarly concluded in *People v. Hester*, 87 Ill. App. 3d 50, 54, 409 N.E.2d 106 (1980), another drug case in which the issue was the defendants' control of the apartment in which drugs were found, that letters found therein were properly admitted because "the [trial] court specifically limited their use, and stated that it was not admitting them to prove the truth of tenancy by defendants. The court admitted the letters as evidence relevant to the question of the defendants' presence at and control over the apartment to which the letters were addressed." *Id.*

¶ 118                *2. Conclusion: Implied Assertions of Fact Contained Within*
                    *Mail and Other Documents Are Not Hearsay*

¶ 119                          a. Persuasive Authority

¶ 120    After considering all the foregoing authority, we conclude that the documents at issue in this case are not hearsay. Because the documents were properly admitted, defendant's trial counsel was not ineffective based on the claim that she did not object to them.

¶ 121    In reaching this conclusion, we have carefully studied the authority earlier cited and find it persuasive. We also agree with the observations of the Tenth Circuit in *McIntyre* that (1) "few courts have considered the issue [now before us] in any detail" and (2) the overwhelming majority of courts have reached the same conclusion we now reach. *McIntyre*, 997 F.2d at 702-03.

¶ 122    An important part of our analysis deals with identifying the matter being asserted within the documents and then asking: Are the documents at issue offered to prove the truth of that matter? If they are not—that is, if they are being offered for a different matter—then the documents are admissible. As the Fifth Circuit explained in *Mazyak*, "the government did not offer these documents to prove the truth of the matter asserted, *i.e.* that a payment for work repairs, a hotel room, fuel, and equipment additions, actually occurred," and therefore the documents were admissible. *Mazyak*, 650 F.2d at 792.

¶ 123    Similarly, in *Sedillo*, the New Mexico Court of Appeals wrote regarding the letter addressed to the defendant about his telephone services that "[t]he State did not intend to prove that [the defendant] was required to pay forty dollars in order to avoid cancellation of his telephone services or that [the defendant] was 'done' and could turn his handset off and then back on." *Sedillo*, 2014-NMCA-039, ¶ 9. Likewise, the Idaho Court of Appeals in *Miller* explained that "[t]he receipt [found with methamphetamine], taken as a whole, does constitute an assertion that a specified sum had been paid by [the defendant] ***. The receipt was not offered by the State to prove such payment ***. Whether [the defendant] had actually made the indicated payment was irrelevant and of no consequence to the State in this prosecution." *Miller*, 106 P.3d at 475. Similarly, in *Shurbaji*, Virginia's appellate court rejected the defendant's argument that the utility bills at issue constituted hearsay. *Shurbaji*, 444 S.E.2d 551. And in the present case, no one cares how much the AT&T bill in defendant's name was for (indeed, we do not know because it was not even included on the page of the bill that was found), nor does anyone care whether that amount—the matter being asserted—was accurate.

¶ 124    We view the decision of the North Carolina Court of Appeals in *Peek* as the most persuasive authority in part because that court relied upon the commentary regarding North

Carolina Rule of Evidence 801 that is essentially the same as the Advisory Committee Notes of 1972 regarding the then-proposed Federal Rule of Evidence 801. We deem the North Carolina commentary very significant because it added to the Advisory Committee Notes this important clarification: "Subdivision (a) differs from current North Carolina law by excluding from the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion." N.C. Gen. Stat. Ann. § 8C-1, Rule 801, Commentary (West 2019).

¶ 125    In our view, that statement from the North Carolina commentary, written nine years *after* the Advisory Committee Notes of 1972, is simply a reiteration of the Advisory Committee Notes' statement that all evidence of conduct, verbal or nonverbal, not intended as an assertion, should be excluded from the hearsay rule of evidence. We reiterate this important portion of the Advisory Committee Notes:

> "The effect of the definition of 'statement' [in subdivision (a)] is to exclude from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion. *The key to the definition is that nothing is an assertion unless intended to be one.*" (Emphasis added.) Fed. R. Evid. 801, Advisory Committee Notes (1972 Proposed Rules).

¶ 126    Further, the circumstances of *Peek*, which involve the admissibility of several pieces of mail found at a particular address that were addressed to the defendant at that address, are remarkably similar to the facts of the present case and make the analysis in *Peek* all the more persuasive. The *Peek* court wrote the following:

> "Defendant's name and address, written or printed on an envelope or its contents, is neither a written assertion nor conduct which is intended as an assertion and, therefore, is not hearsay evidence.
>
> On its face, a written or printed name and address on an envelope asserts nothing. From the sender's conduct in writing or affixing the name and address and mailing the material so addressed, however, it may be inferred that the sender believes the person named lives at that address. *** Nevertheless, because no assertion is intended, the evidence is not hearsay and is admissible. See *United States v. Singer*, 687 F.2d 1135 (8th Cir.1982)." *Peek*, 365 S.E.2d at 322.

¶ 127                    b. Illinois Rules of Evidence Committee Commentary

¶ 128    We do not mean to ignore commentary regarding Illinois Rule of Evidence 801. However, there is no pertinent committee commentary to cite.

¶ 129    The Illinois Rules of Evidence were promulgated in September 2010, effective January 2011, and a committee commentary prepared by the members of the committee appointed by the supreme court to draft the Illinois Rules of Evidence accompanied those new rules. However, although that committee commentary discussed other rules in article VIII of the Illinois Rules of Evidence (which is the article dealing with hearsay), such as Rules 801(d), 803, 804, and 806, that commentary contains no discussion regarding Rule 801(a).

¶ 130    The Illinois Rules of Evidence committee commentary did reveal, however, that the Federal Rules of Evidence played an important role in the drafting of the Illinois Rules of Evidence, as shown by the following description of how the committee went about its task: "Where there was no conflict with statutes or recent Illinois Supreme Court or Illinois Appellate Court decisions, and where it was determined to be beneficial and uniformly or

almost uniformly accepted elsewhere, the Committee incorporated into the Illinois Rules of Evidence uncontroversial developments with respect to the law of evidence as reflected in the Federal Rules of Evidence and the 44 surveyed jurisdictions." Illinois Rules of Evidence, Committee Commentary.

¶ 131    Accordingly, we give serious weight to the Advisory Committee Notes for the then-proposed Federal Rules of Evidence, as well as the North Carolina commentary regarding the North Carolina Rules of Evidence, because (1) we have no committee commentary regarding Illinois Rule of Evidence 801 and (2) the very fact of the absence of such commentary suggests that—to the extent the matter was considered at all—the commentaries accompanying both Federal Rule of Evidence 801 and North Carolina Rule of Evidence 801 were met with the approval of the Illinois rules committee members who were the drafters of Illinois Rule of Evidence 801.

¶ 132                    c. Our Conclusion Is Consistent With Illinois Caselaw

¶ 133    Another reason for reaching our conclusion that the documents at issue in this case are not hearsay is based upon the Illinois Supreme Court decision in *Stewart* that we previously discussed. Although, as we pointed out, the supreme court in *Stewart* did not directly address the precise issue before us, that court nonetheless concluded that a laundry receipt that linked the defendant with a particular room of a motel "was circumstantial evidence which, as stated in Wigmore's Treatise on Evidence, is not objectionable hearsay." *Stewart*, 105 Ill. 2d at 57-58. In so concluding, the supreme court discussed and cited approvingly three decisions of federal courts of appeal that we earlier discussed in support of our conclusion in this case: *Canieso*, *Mejias*, and *Mazyak*. The supreme court's doing so constitutes—at a minimum—some approval of the analysis in those cases.

¶ 134                    d. Our Conclusion Reflects Sound Policy Considerations

¶ 135    As a last matter, we think this result just makes good sense. After all, every juror can be expected to have common experience with mailed utility bills, as well as other mailed documents, and can be expected to accord to such documents whatever evidentiary value they might possess. On this point, we agree with the suggestion from McCormick on Evidence we cited earlier that any claimed deficiencies in the mailed documents would arise from "the chance of honest mistake" and would more sensibly be dealt with by challenging the weight to be given them instead of barring their admission altogether. McCormick on Evidence § 250, at 738-39 (Edward W. Cleary ed., 3d ed. 1984). A juror would understand that a phone bill is being mailed to a person *asserting* that he owes a particular amount on his phone bill and *hoping* that the address to which it is being sent was correct. Jurors' common experiences would also inform them that mistakes can occasionally be made in addressing such bills, perhaps because of incomplete, inaccurate, or late information pertaining thereto. See Illinois Pattern Jury Instructions, Criminal, No. 1.01 (approved July 18, 2014) ("You should consider all the evidence in light of your own observations and experience in life.").

¶ 136    Jurors hardly need to hear from some phone company official to explain why a phone bill contains information that a defendant lives at a certain address when, in fact, the phone company is making no such assertion. To paraphrase the Second Circuit in *Mejias*, the phone bill in this case was not offered to prove the truth of the matter asserted therein, which was that defendant owed money for his phone service. See *Mejias*, 552 F.2d at 446.

- 22 -

¶ 137    No one cared.

¶ 138    Instead, the phone bill contained—at most—an "implicit assertion," which was defendant's address to which the bill was sent. Despite defendant's address being on the bill, the phone company did not intend to assert anything by including that information, and, as the Advisory Committee Notes state, "[T]he key to the definition [of statement under Federal Rule of Evidence 801(a)] is that nothing is an assertion unless intended to be one." Fed. R. Evid. 801(a), Advisory Committee Notes (1972 Proposed Rules).

¶ 139    We also find particularly persuasive the Second Circuit's analysis in *Tin Yat Chin* about the traditional reliability concerns underlying the rule against hearsay:

> "When a category of writings does not trigger the traditional reliability concerns of hearsay—defects in memory, perception, narration, or sincerity—we have sanctioned their admissibility as 'non-hearsay.' " *Tin Yat Chin*, 371 F.3d at 38.

¶ 140    Clearly, the phone bill in this case falls into a category of writing that does not trigger the traditional reliability concerns of hearsay, in particular those of memory or sincerity. We agree with the analysis in the Advisory Committee Notes regarding the then-proposed Federal Rule of Evidence 801(a): "[T]he situations giving rise to the nonverbal conduct are such as virtually to eliminate questions of sincerity. Motivation, the nature of the conduct, and the presence or absence of reliance will bear heavily upon the weight to be given the evidence." Fed. R. Evid. 801(a), Advisory Committee Notes (1972 Proposed Rules). In this regard, we find compelling the point made in Professor Falknor's article that there is a reduced risk of mendacity in implied assertions when the declarant has no real intention of asserting a fact sought to be proved.

¶ 141    We also believe our conclusion is consistent with the guidance provided in Trial Evidence, a treatise on evidence law coauthored by Warren D. Wolfson and Thomas A. Mauet. The former is well known to Illinois judges and practitioners because Warren D. Wolfson is a now-retired justice of the Appellate Court, First District, who served with distinction on that court. He has also been a frequent lecturer for several decades at judicial education programs and is an expert on evidence law. Justice Wolfson has often lectured to judges on a point made in his evidence book that determining the admissibility of any piece of evidence can often be resolved by asking "the three Rs:"

> "1. Is the evidence *relevant* for the offered purpose? If not, the inquiry ends. If the answer is yes,
>
> 2. Is the evidence *reliable* for the offered purpose? If not, even though relevant, it should not be admitted. If yes,
>
> 3. Is it *right* to allow the fact resolver to receive the evidence for the offered purpose? That is, even if the evidence is relevant and reliable, there may be good reasons to keep it out. These include constitutional strictures, matters of social policy, and considerations of unfair prejudice and courtroom efficiency." (Emphases in original.) Thomas A. Mauet and Warren D. Wolfson, Trial Evidence § 1.2 (7th ed. 2020).

¶ 142    When judged in accordance with the guidance provided by Justice Wolfson's "three Rs" analysis, we believe our conclusion in this case—namely, that implied assertions of fact contained within mail and other documents are not hearsay—is correct. In particular, we find support for our conclusion in the following observation made in Trial Evidence:

"The exclusion side of the scale [for weighing the admissibility of evidence] reflects a recognition of the nature of the people in the jury box. They are fallible and untrained for their tasks. Some evidence can overly persuade or be misused; other evidence can be repetitive and cumulative." *Id.*

¶ 143    As we mentioned earlier, jurors can be expected to have had the common experience of receiving bills and other mail and can be further expected to appropriately evaluate the information written thereon. We do not believe such evidence will either overly persuade a jury or be misused.

¶ 144                    e. The Limited Scope of Our Conclusion

¶ 145    We have stated our conclusion in this case as follows: "Implied assertions of fact contained within mail and other documents are not hearsay." We used the terms "mail and other documents" advisedly because (1) only written documents are at issue in this case and (2) we do not wish the scope of our conclusion to be expanded into something we have not addressed.

¶ 146    We emphasize this point because some of the authority we have approvingly cited deals with verbal conduct, as well as nonverbal conduct, the latter being at issue in this case. For instance, the very first paragraph of the Advisory Committee Notes states that the "effect of the definition of 'statement' is to exclude from the operation of the hearsay rule all evidence of conduct, *verbal or nonverbal*, not intended as an assertion." (Emphasis added.)

¶ 147    In our conclusion in this case, we are not including verbal conduct. Given our observation that courts have been wrestling with this issue for almost 200 years, it would be particularly inappropriate to include within our conclusion a context not presented for resolution.

¶ 148    Accordingly, we "leave for another day" the question of whether our conclusion should ever include verbal conduct and express no opinion on that matter.

¶ 149                            f. Contrary Authority

¶ 150    Even though we have concluded that the documents are not hearsay, we acknowledge that contrary authority exists on this issue. See, *e.g.*, *State v. Dullard*, 668 N.W.2d 585 (Iowa 2003); *Bernadyn v. State*, 887 A.2d 602 (Md. 2005); *Stoddard v. State*, 887 A.2d 564 (Md. 2005).

¶ 151    Interestingly, the Supreme Court of Iowa in *Dullard* provided the following analysis about the issue before us, which is whether implied assertions are hearsay:

"The issue we confront has been imbedded in debate and controversy throughout the development of the common law, and has continued to be debated to a large degree following the adoption of the federal rules of evidence. [Citations.] Despite the wealth of legal commentary and some scholarly court decisions on the subject, no clear answer or approach has emerged. [Citations.] In truth, many courts have not engaged in a serious examination of the subject of implied assertions as hearsay, while those who have follow divergent paths. [Citation.] *** The United States Supreme Court has never squarely addressed the issue, but has previously endorsed the concept of implied assertions as hearsay. [4 Clifford S. Fishmon, *Jones on Evidence* § 24:11, at 220 (7th ed. 1992).]" *Dullard*, 668 N.W.2d at 590-91.

¶ 152    Although the Iowa Supreme Court in *Dullard* took a position on implied assertions as hearsay different from the conclusion this court has reached, the *Dullard* court also wrote the following: "Federal rule of evidence 801(a) appears to support the departure from the common

- 24 -

law, evidenced more by the advisory committee note accompanying the rule than the language of the rule itself." *Id.* at 592.

¶ 153　　We also note that Professor Michael H. Graham has similarly expressed his disapproval of the conclusion we have reached in this case. See 6 Michael H. Graham, Handbook of Federal Evidence § 801:10, at 156-64 (7th ed. 2012). Professor Graham provides some additional commentary—and suggestions—on this subject as follows:

> "Courts and commentators have struggled with the definitional aspects of hearsay under the cloud that given the pigeonhole theory of class exceptions to the hearsay rule, many trustworthy and necessary statements if classified as hearsay would be excluded at trial. Attempts to expand admissibility through novel interpretations of the definition of hearsay naturally resulted. *** While novel, such interpretations are neither correct interpretations of the definition of hearsay nor do they comport with the analysis of risks the hearsay rule attempts to address. Such novel interpretations have at the same time greatly confused not only many practitioners and courts but thousands of law students each year. Whatever value these novel interpretations once had is no longer true today. With the availability of the residual hearsay exception of [Federal] Rule 807, trustworthy and necessary hearsay will no longer be inadmissible simply because it fails to fit neatly into one of the pigeonhole hearsay exceptions." Michael H. Graham, Winning Evidence Arguments § 801:10 (Jan. 2020 update).

¶ 154　　What is interesting—and significant—about Professor Graham's analysis is that he seems to be acknowledging that, under certain circumstances, some hearsay may in fact be "trustworthy and necessary"—like, for instance, utility bills or the mail in this case. He expresses regret over the confusion the efforts to deem such statements exceptions to the hearsay rule have caused, and he urges such efforts to stop. In lieu thereof, he proposes that the residual hearsay exception set forth in Federal Rule of Evidence 807 can serve as the vehicle for admissibility so that "trustworthy and necessary hearsay will no longer be inadmissible simply because it fails to fit neatly into one of the pigeonhole hearsay exceptions." *Id.*

¶ 155　　The problem with Professor Graham's analysis—at least as far as Illinois is concerned—is that the Illinois Supreme Court has *not* adopted the residual hearsay exception contained in Federal Rule of Evidence 807. As a result, Illinois courts and practitioners will continue to need to provide interpretations of hearsay—as we are doing in this case—or otherwise "trustworthy and necessary hearsay"—like utility bills linking a defendant to the premises on which they are found—would not be admissible, even though it appears plain that they should be.

¶ 156　　Accordingly, although we are always reluctant to disagree with Professor Graham, we deem his analysis unhelpful for Illinois courts and practitioners until such time—if ever—as the Illinois Supreme Court, in its wisdom and judgment, chooses to adopt Federal Rule of Evidence 807 as part of the Illinois Rules of Evidence. Until then, Illinois, quite literally, plays by a different set of rules.

¶ 157　　　　　　　　B. The Prosecutor's Allegedly Improper Closing Argument

¶ 158　　Defendant next argues that he was denied a fair trial because during closing arguments, the prosecutor (1) misstated the evidence presented at trial and (2) improperly vouched for the credibility of his witnesses by saying he did not believe the State's witnesses or the prosecutor

himself distorted evidence. Defendant contends that the prosecutor "invoked the integrity of his position that he was a distinguished member of the Bar." Defendant claims that the prosecutor provided unsworn testimony during closing argument when he (1) said he was personally offended by defense counsel's suggestion of evidence tampering and (2) sought to explain why some pills were retested by the State's expert. Defendant further claims that the prosecutor improperly vouched for his witnesses, "personally assuring the jurors that no tampering [with the evidence] took place." We reject all of defendant's claims.

¶ 159                                 1. *Defense Counsel's Closing Argument*

¶ 160        During defense counsel's closing argument, she questioned whether Julia Edwards's testimony was "reasonable" or "logical." Counsel suggested that Edwards came up with the result in her 2016 report only when the State told her to "try again." Defendant's counsel argued that "Phenethylamine is not benzeneethanamine" and that Edwards "never could give an explanation" for the difference. Counsel argued, "I think she tested it the first time in 2015, it didn't have the words, the statement, the scientific name that matched with anything in the Controlled Substance Act. The State said here it is again, try again, and suddenly, magically, now it's exactly what it says in the statute."

¶ 161        Later on in her closing argument, defense counsel addressed the text messages, pointing out that they were supposedly sent by defendant at a time when he was in police custody and being transported from the traffic stop to the police station. Counsel then argued that (1) the police officers searched defendant during the traffic stop but never opened the case on defendant's belt, (2) "when they arrived back at the station, this cell phone has magically appeared now in [defendant's] right front pants pocket," and (3) the phone case was now missing and was not entered into evidence. Counsel argued, "The whole thing bothers me, and I'm not going to suggest to you what I think happened." But counsel then reiterated, "I defy anybody to be able to do that with their hands cuffed behind their back without at least somebody being able to see ***. How does that happen? I don't think it does."

¶ 162                                 2. *The Prosecutor's Rebuttal Argument*

¶ 163        In the prosecutor's rebuttal argument, he stated the following:

> "My understanding of her defense, she didn't flat out say it, but I will say it for her, is apparently I'm corrupt, telling the crime lab to retest and get whatever results I need. The crime lab is corrupt because they're going to do that, and the [police are] corrupt because they're going to plant text messages. I absolutely disagree with that. Obviously, as a professional and a respected member of the Bar, that offends me, even though she didn't come out and say it."

¶ 164        Later in the prosecutor's rebuttal argument, he stated the following:

> "[Julia Edwards] told you the first time she tested it, it indicated for 25C-NBOMe, but she couldn't call it. So when we sent it back after we got the fingerprint match to do the retest because there's no fingerprints on the heroin bag, she did her job, she tested it, and the results she got on the retest is she could call it 25C-NBOMe because of the research she did and the advanced techniques she used."

¶ 165                    3. *The Law Regarding Prosecutors' Closing Arguments*

¶ 166    Attorneys enjoy wide latitude in the content of their closing argument. *People v. Jackson*, 2020 IL 124112, ¶ 82. "A reviewing court will find reversible error only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *Id.* ¶ 83.

¶ 167    The Supreme Court of Illinois has long held that "[t]he prosecutor may also respond to comments by defense counsel which clearly invite a response." *People v. Hudson*, 157 Ill. 2d 401, 441, 626 N.E.2d 161 (1993); see also *People v. Willis*, 2013 IL App (1st) 110233, ¶ 110, 997 N.E.2d 947 ("[T]he prosecution may fairly comment on defense counsel's characterizations of the evidence and may respond in rebuttal to statements of defense counsel that noticeably invite a response [citation]."); *People v. Hammonds*, 409 Ill. App. 3d 838, 866, 957 N.E.2d 386 (2011) (noting that a defendant cannot be heard to complain about an argument he invited).

¶ 168                                    4. *This Case*

¶ 169    Contentions about a prosecutor's allegedly improper closing arguments, like those defendant makes in this case, occur frequently. In the great majority of those cases, we have found such claims to be meritless. This case is just the latest example. Consistent with what the supreme court wrote in *Hudson*, defense counsel's argument in this case—impugning the ethics not only of the police and the expert lab analyst, but also of the prosecutor himself— "clearly invite[d] a response." *Hudson*, 157 Ill. 2d at 441. We conclude that, if one side calls the other a liar, it is perfectly within the bounds of proper argument to bluntly respond. Defendant on appeal asks us to conduct a plain-error analysis regarding the prosecutor's allegedly improper closing argument. However, because we conclude no error occurred, we need not do so.

¶ 170    In concluding this discussion, we note that we have frequently repeated this court's view that trying felony cases before a jury "ain't beanbag" and "we expect advocates in our adversary system of justice to use all of their forensic skills to persuade the jury of the wisdom or justice of their respective positions." See *People v. Montgomery*, 373 Ill. App. 3d 1104, 1118, 87 N.E.2d 403 (2007), *abrogated on other grounds by People v. Ayres*, 2017 IL 120071, 88 N.E.3d 732; *People v. Palmer*, 382 Ill. App. 3d 1151, 1161, 889 N.E.2d 244 (2008); *People v. Dunlap*, 2011 IL App (4th) 100595, ¶ 28, 963 N.E.2d 394; *People v. Staake*, 2016 IL App (4th) 140638, ¶ 102, 78 N.E.3d 388, *aff'd*, 2017 IL 121755. We take this opportunity to do so again.

¶ 171          C. Defendant's Claim That the Trial Court Erred Because It Did Not
                    Properly Admonish Potential Jurors Under Rule 431(b)

¶ 172    Defendant next argues that the trial court erred because it did not properly admonish potential jurors under Rule 431(b). Specifically, defendant contends that the trial court, instead of asking each potential juror whether he or she understands and accepts that "*if the defendant does not testify*, it cannot be held against him or her," instead repeatedly admonished the jurors that "the *defendant's failure to testify* cannot be held against him." (Emphases added.) As a consequence, defendant contends that, "[b]y using that improper phrasing, the circuit court violated Rule 431(b), prejudiced the jurors against [defendant], and tipped the scales of justice

in this closely balanced case." In support of this claim, defendant points out that, because he never testified, the trial court's error is all the more serious.

¶ 173 In making this argument, defendant concedes that he did not object to the trial court's improper admonitions for perspective jurors, nor did he include it in a timely motion for a new trial. Nonetheless, he argues that this court should review the trial court's violation of Rule 431(b) as plain error. He contends that the first prong of the plain-error doctrine applies to these circumstances.

¶ 174 The State concedes that the trial court erred by not following Rule 431(b) in its admonitions to prospective jurors. However, the State contends that the plain-error doctrine does not apply because the evidence was not closely balanced. For the reasons that follow, we agree with the State.

¶ 175                     1. *The Plain-Error Doctrine*

¶ 176 The Illinois Supreme Court recently explained the plain-error doctrine as follows:

> "A reviewing court will consider unpreserved error when a clear or obvious error occurs and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. [Citations.] When a defendant fails to establish plain error, the result is that his procedural default must be honored." *Jackson*, 2020 IL 124112, ¶ 81.

¶ 177 In *People v. Sebby*, 2017 IL 119445, ¶ 53, 89 N.E.3d 675, the supreme court held that "[i]n determining whether evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case."

¶ 178             2. *The Overwhelming Evidence Against Defendant*

¶ 179 The crimes with which the State charged defendant—possession of various drugs found in the residence at 1344 East Division Street in Decatur—required the State to prove beyond a reasonable doubt that defendant had constructive possession of those drugs.

¶ 180                 a. The Law of Constructive Possession

¶ 181 In *Loggins*, 2019 IL App (1st) 160482, ¶ 45, Justice David Ellis noted that the State had to prove the defendant "had knowledge and possession of the drugs," which were both questions of fact for the jury to resolve. The First District then wrote the following:

> "Possession is constructive, as the State alleged here, when a defendant has the 'intent and capability to maintain control and dominion' over an item of contraband, though he does not have immediate personal control of it. [Citation.] The intent (and capability) to control the *item* can be inferred when the defendant 'exercised immediate and exclusive control' over the *area* where that item was found. [Citation.] And control over the area generally can be inferred when the area is within the defendant's residence." (Emphases in original.) *Id.* ¶ 47.

¶ 182    The First District further noted that "once possession has been proven, knowledge may be inferred from 'the surrounding facts and circumstances' of the possession, including the defendant's declarations, acts, or conduct." *Id.* ¶ 56.

¶ 183    We also note that, 60 years ago in a constructive possession case, the Illinois Supreme Court held that, even though the evidence against a defendant must show that he was in "exclusive possession" of the narcotics in question, "possession of narcotics may be joint." *People v. Embry*, 20 Ill. 2d 331, 335-36, 169 N.E.2d 767 (1960). The court explained that "[t]o hold otherwise would permit two or more persons to gain immunity from prosecution on a charge of unlawful possession of narcotics by proving joint possession of the drugs." *Id.*

¶ 184                                             b. This Case

¶ 185    In explaining our conclusion that the evidence of defendant's guilt was overwhelming, we need not mention again all of the evidence presented at trial but instead highlight the evidence that led us to this conclusion:

    (1) The police saw defendant come and go from the residence and spend hours therein, on both the day they searched it and the day before.

    (2) The residence contained adult men's clothing in one of its bedrooms, but the only people present when it was searched were Walker and her two young children.

    (3) The record contains no suggestion that any other adult male had any connection to the residence, leaving the strong inference that the adult men's clothing in the closet was defendant's.

    (4) Walker testified that, on the date her residence was searched and she was arrested, she was living in that residence with defendant and her two young children. Walker also testified that she knew the police found illegal drugs inside her residence and defendant was the owner of those drugs. On cross-examination, defense counsel asked Walker the following question: "And so [defendant] bought the house at 1344 East Division, but you live there?" Walker responded, "That's not correct. *We both live there*." (Emphasis added.)

    (5) The residence had multiple trappings of drug distribution—namely, baggie corners, digital scales, guns, security cameras, and large quantities of drugs hidden in (a) the oven broiler, (b) the freezer of the refrigerator, and (c) the living room vent. All of this compels the conclusion that *someone* who lived in the residence was involved in the business of trafficking in illegal drugs, and the only adult besides defendant who lived in the residence was Walker. Although defense counsel in her closing argument attempted to suggest that perhaps Walker was the drug dealer, nothing in this record suggests that Walker sold drugs to the exclusion of defendant.

    (6) Defendant's fingerprint was found on one of the bags containing illegal drugs that was hidden in the vent.

    (7) While defendant was transported from the traffic stop to the police station, he sent text messages from his cell phone to a phone found in the residence saying, "Get everything out of the house now," and "Flush it." Both messages were directed to "Wifee."

    (8) Other messages were also extracted from defendant's cell phone that, according to the expert, revealed that defendant was involved in illegal drug trafficking.

(9) When searching the residence, the police found a deed to the residence showing defendant had an ownership interest in it.

(10) The police found a real estate business card in defendant's wallet showing that he had paid $450 rent for the residence "for November."

(11) The police also found an AT&T bill in the residence for August 2015 that was addressed to defendant at the residence.

(12) The police found an unopened envelope in the residence from American Family Insurance showing that it was mailed to defendant at the residence's address.

(13) When the police made the traffic stop upon defendant and told him that he had been at 1344 East Division Street, he responded: "No, I wasn't. No, I wasn't." However, the police had just seen him drive away from that residence.

¶ 186    Because defendant did not raise the issue of the trial court's failure to comply with Rule 431(b) in the trial court, we will reverse defendant's conviction and remand for a new trial only if we first conclude that the first prong of the plain-error doctrine applies—namely, that the evidence is closely balanced. Here, evidence of defendant's guilt is hardly closely balanced; indeed, it is overwhelming. Accordingly, we decline to apply the plain-error doctrine in this case, with the result that his procedural default must be honored.

¶ 187                    3. *Trial Courts Must Stop Deviating From the*
                            *Requirements of Rule 431(b)*

¶ 188    The issue in this case—namely, the failure of the trial court to strictly comply with Rule 431(b)—should never have arisen, and, indeed, *should never arise in any case*. That is because there is no excuse for a trial judge to not strictly comply with the clear and explicit directions the supreme court has provided for trial courts when admonishing prospective jurors.

¶ 189    Being a trial judge can be a difficult job, often requiring careful study to properly apply difficult legal concepts and to ensure that a jury is properly instructed on the law. However, admonishing prospective jurors pursuant to Rule 431(b) is not a difficult task.

¶ 190    It could hardly be easier.

¶ 191    *Thirty-six years ago*, the supreme court in *People v. Zehr*, 103 Ill. 2d 472, 477, 469 N.E.2d 1062 (1984), set forth four principles (now known as the *Zehr* principles) about which trial courts need to instruct prospective jurors to ensure that defendants receive a fair trial. Then, just to make sure trial courts understood *exactly* what admonitions to give to prospective jurors, the supreme court promulgated Rule 431(b) in 2007, in which it explicitly set forth the precise language trial courts should use to ensure that prospective jurors "understand and accept" the *Zehr* principles. Yet, here we are, 36 years after *Zehr* and 13 years after the supreme court promulgated Rule 431(b), and we are still dealing with a trial court's failing to do what the supreme court has directed.

¶ 192    We remind trial courts that supreme court rules are not suggestions, to be complied with when convenient or unless the trial courts believe they could better explain these fundamental principles to the jurors than Rule 431(b) does.

¶ 193    They cannot.

¶ 194        4. *What Is at Stake Because of Failure to Comply With Rule 431(b)*

¶ 195        The Illinois Supreme Court in *Sebby* made clear that a trial court's failure to comply with Rule 431(b) is plain error. Whether that plain error will result in a reversal of a defendant's conviction and remand for a new trial depends upon a reviewing court's assessment regarding whether the evidence of defendant's guilt is closely balanced.

¶ 196        Whenever a reviewing court concludes that reversal is required because (1) the trial court failed to comply with Rule 431(b) and (2) the evidence of defendant's guilt is closely balanced, that reversal is due to judicial malpractice. And prosecutorial malpractice, if the prosecutor stood idly by and permitted this easily corrected judicial error to go unchallenged. The prosecutor is the one responsible for protecting the record and must be on high alert to ensure it does not contain any obvious errors. There is scarcely a clearer, more obvious, and more easily correctable error than a trial court's failure to precisely comply with Rule 431(b).

¶ 197        Although this court has concluded in this case that the evidence was not closely balanced, we know from experience that the evidence of a defendant's guilt in many cases on appeal *is* closely balanced. So, in the event that the trial court fails to comply with Rule 431(b) and the evidence of defendant's guilt is closely balanced, the following conversation might need to take place (otherwise known as the conversation no prosecutor ever wants to have):

> "Hello, Mrs. Jones? This is Charles Brown calling. I'm the prosecutor who three years ago convicted Thomas Smith of raping and murdering your daughter, Susan, for which he received a 50-year sentence. I regret to inform you that the appellate court has reversed those convictions because, even though it concluded Smith received a fair trial, it also concluded that the trial court did not properly admonish the prospective jurors in that case.
>
> As a result of that decision, even though Smith committed those crimes five years ago, in order to keep him in prison, we will have to try him again.
>
> If we can."

¶ 198        D. The Trial Court Properly Conducted a *Krankel* Hearing

¶ 199        Last, defendant argues that the trial court erred by how it conducted the *Krankel* hearing in this case and by determining that the appointment of new counsel was not appropriate to pursue defendant's claim that his trial counsel was ineffective. Citing this court's decision in *People v. Roddis*, 2018 IL App (4th) 170605, ¶¶ 79-80, 119 N.E.3d 52, defendant contends that the trial court committed reversible error by rejecting defendant's ineffective-assistance-of-counsel claim only after evaluating its ultimate merits and determining that trial counsel was not ineffective.

¶ 200        1. *The Law Governing* Krankel *Hearings*

¶ 201        Although defendant's characterization of this court's decision in *Roddis* is correct, the Supreme Court of Illinois reversed this court and wrote the following:

> "[E]ven in preliminary *Krankel* inquiries, a trial court must be able to consider the merits [of the defendant's ineffective assistance of counsel claims] *in their entirety* when determining whether to appoint new counsel on a *pro se* posttrial claim of ineffective assistance of counsel. This serves both the ends of justice and judicial economy." (Emphasis in original.) *People v. Roddis*, 2020 IL 124352, ¶ 61.

¶ 202    The supreme court in *Roddis* elaborated upon this point, as follows:

> "The trial court, most familiar with the proceedings at issue, remains best situated to serve the interests of judicial economy by extinguishing conclusory claims. We decline to unduly limit the most effective arbiter between patently frivolous claims and those showing possible neglect. The court can 'base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face.' [Citation.]" *Id.* ¶ 56.

¶ 203    In *Roddis*, the supreme court acknowledged that "the trial court inaccurately stated 'I will rule as to whether or not I find that there was ineffective assistance in this situation.' " *Id.* ¶ 67. Nonetheless, the supreme court ruled as follows: "Although the court's description may have contained a few misnomers, this was an appropriately conducted inquiry. Defendant's allegations were either matters of trial strategy or unfounded claims." *Id.*

¶ 204    In the supreme court's recent decision in *People v. Jackson*, 2020 IL 124112, ¶ 97, that court further clarified its holding in *Roddis* regarding *Krankel* procedures by writing the following:

> "If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed."

¶ 205    In *Jackson*, the supreme court further wrote the following:

> "Whether the trial court properly conducted a *Krankel* preliminary inquiry presents a legal question that we review *de novo*. [Citations.] However, if the trial court has properly conducted a *Krankel* inquiry and has reached a determination on the merits of the defendant's *Krankel* motion, we will reverse only if the trial court's action was manifestly erroneous." *Id.* ¶ 98.

¶ 206                                    *2. Defendant's Claims*

¶ 207    Defendant *pro se* filed a posttrial motion alleging that his trial counsel was ineffective. At the trial court's request that he reduce all of his claims against counsel to a written motion, defendant complied and made several detailed allegations against her in the motion he filed. These were generally that she failed to (1) call certain witnesses, including his parole agent, Bill Cooper, to testify, (2) sufficiently investigate Walker, (3) challenge the validity of the search warrant, (4) retest the pills, and (5) require the informant supporting the search warrant to appear in court.

¶ 208    The trial court then conducted a *Krankel* hearing in which the court (1) carefully went over each of the complaints defendant raised, (2) asked defendant for any further commentary regarding them, and (3) asked his trial counsel to respond. We note that the trial court, in its thoughtful explanation as to why it was not going to appoint counsel for defendant, stated the following: "I did have the opportunity, first of all, to observe [defense counsel] in the trial. I thought she was extremely competent, prepared, and capable during the trial. So that certainly is something I can make part of the record." The court further discussed at length the allegations the defendant made in his written motion, defendant's remarks at the *Krankel* hearing, and defense counsel's responses, all of which revealed a careful understanding of

defendant's complaints in the context of the trial the court had just concluded. In effect, the court deemed the decisions counsel made to be matters of trial strategy, which the court found did not constitute ineffectiveness. The court explained as follows: "Her preparation that the court saw was highly competent. I do not find that her representation fell below any objective standard of reasonableness. So, according to the *Strickland v. Washington*[, 466 U.S. 688 (1984), standard], I'm not going to find that [defense counsel] was ineffective."

¶ 209 Consistent with what the supreme court has recently written regarding *Krankel* hearings, we conclude that how the trial court conducted the *Krankel* hearing in this case and the court's findings were appropriate. The record shows that the court based "its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." (Internal quotation marks omitted.) *Roddis*, 2020 IL 124352, ¶ 56. Accordingly, we reject defendant's argument that the trial court committed any error when conducting the *Krankel* hearing or in its findings.

¶ 210                                            III. CONCLUSION
¶ 211          For the reasons stated, we affirm the trial court's judgment.

¶ 212          Affirmed.